Rowe v. Rivera                    CV-99-249-JD  06/15/00

UNITED STATES DISTRICT COURT FOR THE
                    DISTRICT OF NEW HAMPSHIRE


David B. Rowe

     v.                              Civil No. 99-249-JD
                                     Opinion No. 2000 DNH 137
Ada Rivera, et al.


                           O R D E R


     The plaintiff, David B. Rowe, proceeding pro se, brings a

Bivens[1] action against seven federal defendants, alleging that

while he was detained by the Immigration and Naturalization

Service ("INS"), they were deliberately indifferent to his

serious medical needs for eye glasses and surgery to remove a

cataract.  The defendants move for summary judgment on the

grounds that the plaintiff cannot show that they acted with

deliberate indifference or, alternatively, that they are entitled

to qualified immunity.  The plaintiff objects to summary

judgment.


                       Standard of Review

     Summary judgment is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file,

_____

     [1]See Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S.
388 (1971).

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The record evidence is taken in the light most favorable to the nonmoving party. See Zambrana-Marrero v. Suarez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party and a 'material' fact is one that might affect the outcome of the suit under governing law." Fajardo Shopping Ctr. v. Sun Alliance Ins. Co., 167 F.3d 1, 7 (1st Cir. 1999). Summary judgment will not be granted as long as a reasonable jury could return a verdict in favor of the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).


Background

The plaintiff, David Rowe, was detained in INS custody at the Merrimack County Department of Corrections in Boscawen, New Hampshire, beginning on August 1, 1997. Rowe complained of eye fatigue while he was detained in Merrimack County. The United States Public Health Service, Division of Immigration Health Services, authorized an eye examination for Rowe, which was

2

performed by Dr. Hogan.[2]  On February 27, 1998, Dr. Hogan examined Rowe and diagnosed farsightedness in Rowe's left eye and a dense traumatic cataract in Rowe's right eye with very poor vision.  Dr. Hogan recommended surgery to remove the cataract in Rowe's right eye and suggested that he wear eye glasses full time to protect and improve the vision in his left eye, but Dr. Hogan did not prescribe glasses for Rowe.

Phyllis M. Butler, staff nurse at the Merrimack County facility, sent Dr. Hogan's recommendation about treatment for Rowe by facsimile transmission ("fax") to the Boston INS office on February 27, 1998.  Butler was notified on March 12 that medical requests and information were to be sent to the INS office in Bethesda, Maryland.  Butler then sent the information to Captain Nina Dozoretz in Maryland.  In the course of another medical request for Rowe sent on May 7, 1998, Butler noted that Rowe asked frequently if authorization had been received for his surgery and glasses and reminded Captain Dozoretz of the

---

[2]Under the agreement providing for detention of INS detainees in local or state jails, the jail provides the same in-house medical services to INS detainees as it would to its own detainees.  Medical services that cannot be provided by the local or state jail must be pre-authorized by the Division of Immigration Health Services.  The record is conflicting as to whether the Division or the INS pays for services that are authorized and provided.

recommendation and Butler's three unanswered requests for authorizations.

In the meantime, Nurse Butler's request for authorization based on Dr. Hogan's recommendations had been forwarded to the Department of Immigration Health Services. On March 17, 1998, Dr. Ada Rivera, Chief of Clinical Operations in the Division of Immigration Health Services, authorized the cataract surgery. Butler faxed the estimated costs for Rowe's surgery on May 14, 1998, to Steven Wacha, a registered nurse and managed care coordinator with the Division of Immigration Health Services. On May 15, Wacha wrote to Butler that authorization for Rowe's surgery was granted and that the surgery was to be performed by Dr. Scott at the Lakes Region Hospital, Laconia, New Hampshire.

Rowe notes that his money account at the Merrimack County jail was closed on May 15, 1998, the same day that Wacha faxed his authorization to Butler at the jail. From that circumstance, Rowe infers that Wacha also faxed his authorization to the INS Boston division, and that the decision was made that day to transfer him away from Merrimack to avoid the cost of the surgery that had been authorized.

Early on May 18, 1998, Richard Doucet, Deputy Superintendent of the Merrimack County jail, made a request to INS officials in Boston to transfer Rowe out of that facility. Doucet says the

4

transfer was requested "because of concerns that he would not follow physician's instructions or otherwise cooperate with his care following surgery on his eye and would, as a result, cause himself harm while in Merrimack's custody." Pl. Ex. J.

When Nurse Butler arrived at work on Monday morning, May 18, she found a fax from Wacha, approving Rowe's surgery and a note that the INS would be transferring Rowe out of Merrimack County that day. Because of the transfer, Butler did not schedule the authorized surgery.

James Dupont, Supervisory Detention and Deportation Officer of the INS for the Boston district, authorized Rowe's transfer from Merrimack County to the Hillsborough County Department of Corrections, in Manchester, New Hampshire, on May 20, 1998. Despite Deputy Superintendent Doucet's stated reason for requesting Rowe's transfer, Dupont says in his declaration that Rowe was transferred because Merrimack no longer wanted to house INS detainees. Dupont says that he had no knowledge of Rowe's eye problems or the surgery authorization when Rowe was transferred from Merrimack County. Rowe was transferred to Hillsborough County on May 20.

As a result of Rowe's transfer to Hillsborough, Wacha received another request for preauthorization of treatment for Rowe's cataract. On June 4, 1998, Wacha notified Hillsborough

5

that the Division of Immigration Health Services authorized a pre-operation consultation and surgery with Dr. Randall Brown of New Hampshire Eye Associates in Manchester, New Hampshire. Dr. Brown examined Rowe on June 23, 1998, and diagnosed a traumatic cataract in the right eye caused by an injury when Rowe was hit in the eye by a cricket ball twenty years earlier. He recommended that Rowe could be referred to Boston for surgery after he was out of jail. Dr. Brown found that Rowe's vision in his left eye was 20/20. Rowe states in his declaration that Dr. Brown told him he could not examine in the back of his eye to determine whether there was retinal detachment and could not perform the cataract removal surgery because he did not have the right equipment.

On August 4, 1998, Wacha received a request from Hillsborough County that Rowe be authorized for cataract surgery by a specialist in Boston. Based on Dr. Brown's examination and recommendation that the surgery could wait until Rowe was released from jail, Wacha recommended to Ada Rivera that the requested cataract surgery be denied. Dr. Rivera agreed with Wacha's recommendation, and on August 20, Wacha notified Hillsborough that the requested authorization was denied.

While in detention, Rowe continued to challenge his INS custody status. He wrote to Steven Farquharson, INS District

6

Director in Boston, on November 20, 1997, from the Merrimack County jail seeking to make arrangements for Rowe's wife to take pictures at the jail to be used in his request for an adjustment in custody status. In a letter dated August 7, 1998, sent in response to Rowe's request for a change in custody status, Farquharson reviewed Rowe's detention history and the previous determinations denying him bond based on findings that Rowe posed a danger to the community due to his propensity for violence. Farquharson denied Rowe's request for release.[3]

Rowe filed suit in this court on October 13, 1998, seeking an injunction to compel the INS to provide the cataract surgery and eye glasses recommended by Dr. Hogan. See Rowe v. Dozoretz, 98-CV-569-JD. Rowe was examined by Dr. Barry Jacobs of New Hampshire Eye Associates on November 11, 1998, as authorized by Annette Kolter, a managed care coordinator with the Division of Immigration Health Services. Dr. Jacobs reported to Kolter that Rowe had no progressive disease in his eyes, that his left eye

---

[3]Rowe argues that it can be inferred that Farquharson and an INS contracting officer, Roger Fregeau, knew of his need for cataract surgery and eye glasses and ignored it. The inferential chain Rowe asserts, however, is not supported with record evidence and depends in large part on unsubstantiated assertions and conclusory allegations that are not sufficient to oppose summary judgment. See Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

would not be damaged if cataract surgery for the right eye were delayed. Dr. Jacobs wrote: "In other words, the cataract procedure is not urgent. It can wait for his release from jail." Dr. Jacobs also stated that Rowe's intermittent difficulty with reading vision in his left eye could be corrected with eye glasses, and provided a prescription.

Hearings were held on Rowe's request for injunctive relief on November 12 and 18, 1998. Reading glasses were provided to Rowe on November 16, although Rowe disputes whether they were the glasses prescribed by Dr. Jacobs.[4] During the hearing on November 18, Rowe and the defendants entered into a stipulation to resolve the issues raised in that suit. The Division of Immigration and Health Services agreed to authorize that Rowe receive B-scan ultrasound testing by a sub-specialist as soon as the test could be scheduled, and that Rowe would be scheduled for routine follow-up eye examinations twice annually as long as he remained in INS custody. Under the terms of the stipulation, Rowe withdrew his requests for injunctive relief, and the case

---

[4]Rowe argues that the glasses he was given were over-the-counter magnifying glasses rather than prescription glasses. The record is unclear as to which kind of glasses the INS provided. Although Rowe claims that his vision has since deteriorated in his left eye due to the lack of proper glasses while he was detained, he provides no evidence in support of this claim.

8

was dismissed without prejudice.

Rowe underwent an examination and a B-scan ultrasound procedure conducted by Dr. Bradford Shingleton of Ophthalmic Consultants of Boston on December 10, 1998. Dr. Shingleton reported on December 12, 1998, that Rowe had 20/20 vision in his left eye and a traumatic membranous cataract in his right eye. Dr. Shingleton found that the retina was attached and found no evidence of detachment or masses. He stated that cataract surgery would improve Rowe's vision in his right eye, although he was not sure as to the extent of the improvement. Dr. Shingleton also stated that the eye was "very quiet without inflammation and there certainly is no rush for surgery. This can be performed anytime." Defs. Ex. 3, Att. F.

Dr. Jacobs examined Rowe again on April 27, 1999. He found that Rowe had normal vision in his left eye using eye glasses, which were the appropriate corrective lenses he had previously prescribed. Dr. Jacobs found no change in the condition of Rowe's right eye and found normal pressure in both eyes.

Rowe filed the present suit in this court on June 7, 1999, seeking damages based on allegations they he had been denied needed medical care while in INS custody in violation of the Fifth Amendment. Rowe also sought an injunction to require the INS to provide him with cataract surgery and proper eye glasses.

9

A hearing was held on June 30, 1999, on Rowe's motion for injunctive relief. Dr. Jacobs testified about the diagnoses pertaining to Rowe's eyes, and the present status of the cataract and his right eye. Rowe questioned Dr. Jacobs about the glasses provided by the INS, asking whether they were the correction he had prescribed or just over-the-counter magnifying glasses. Dr. Jacobs explained that there was little difference between his prescription and magnifying glasses. He examined Rowe's glasses and said that they appeared to be prescription glasses rather than over-the-counter magnifying glasses, although he could not be sure.

Dr. Jacobs gave his opinion that Rowe was at some increased risk of developing glaucoma. In his opinion, surgery to remove the cataract would likely improve Rowe's vision, but there was no urgency in performing the surgery, and he characterized the surgery as "elective." Dr. Jacobs said that in the short term there was practically no risk to the vision in Rowe's right eye if the surgery were not performed. He agreed with Rowe that due to the cataract, it would be difficult to detect or diagnose retinal detachment in that eye, if it should occur. Dr. Jacobs also agreed that surgery would improve Rowe's safety because he could see things on his right side that he did not see with the cataract and improve his overall functioning. He recommended

10

follow-up examinations every four to six months to rule out any undetected increased pressure in the eye or inflammation.

On July 1, 1999, the court denied injunctive relief, concluding that the record did not demonstrate that Rowe was likely to suffer irreparable harm if cataract surgery were not performed immediately. The court expressed concern, however, about Rowe's future need for surgery if he were retained in INS custody indefinitely and questioned the reasonableness of the INS's efforts to avoid providing surgery in this case. Rowe was released on bond on July 9, 1999, pursuant to the order of an Immigration Judge after review of Rowe's custody status.

Rowe states in his declaration that he had a pre-operative examination done by Dr. Murphy of Massachusetts Eye and Ear Associates on March 20, 2000. Rowe says that he asked Dr. Murphy about the glasses the INS provided and that Dr. Murphy tested the glasses and found them to be over-the-counter glasses rather than prescription glasses. Rowe also discussed Dr. Hogan's suggestion that Rowe wear glasses to protect and improve his vision in his left eye. Dr. Murphy explained, Rowe states, that to both protect and improve his vision he would need bifocal glasses with polycarbonate lenses, and he gave Rowe a prescription for those glasses. Rowe included a copy of the prescription in his materials, but did not submit any other records from his

11

examination with Dr. Murphy.

## Discussion

The defendants move for summary judgment on the grounds that based on the facts of record, Rowe cannot show that they were deliberately indifferent to his serious medical needs. Alternatively, the defendants argue that they are entitled to qualified immunity from Rowe's claims against them. Rowe objects to summary judgment, contending that the evidence shows the defendants' deliberate indifference to his need for cataract surgery and eye glasses.[5]

"A person may sue a federal official in his or her individual capacity for damages arising out of a constitutional violation." Aversa v. United States, 99 F.3d 1200, 1213 (1st Cir. 1996) (citing Bivens, 403 U.S. 388). The due process clause of the Fifth Amendment protects the rights of INS detainees to medical care. See Edwards v. Johnson, 209 F.3d 772, 778 (5th Cir. 2000). Detainees are entitled to medical assistance for serious medical needs and a constitutional violation occurs when an official is deliberately indifferent to such needs. See Consolo v. George, 58 F.3d 791, 794-95 (1st Cir. 1995).

---

[5]Since Rowe is no longer detained in INS custody, his request for injunctive relief is now moot. See, e.g., Murphy v. Hunt, 455 U.S. 478, 481-82 (1982); Purvis v. Ponte, 929 F.2d 822, 825 (1st Cir. 1991); Garcia v. DeBatista, 642 F.2d 11, 12-13 (1st Cir. 1981).

"A 'serious medical need' is one 'that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Mahan v. Plymouth County House of Corrections, 64 F.3d 14, 18 (1st Cir. 1995) (quoting Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 208 (1st Cir. 1990). Deliberate indifference in the prison context requires "an actual, subjective appreciation of risk," meaning that "'the official knows of and disregards an excessive risk to inmate health or safety.'" Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). The defendant official's knowledge of a substantial risk is a factual question that may be demonstrated "'in the ususal ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Id. (quoting Farmer, 511 U.S. at 842). On the other hand, officials will not be liable if they responded reasonably to a known substantial risk. See Farmer, 511 U.S. at 844.


A.  Cataract Surgery

The defendants argue that Rowe cannot show that they were aware that Rowe's cataract condition exposed him to a serious

14

risk of harm and that they nevertheless failed to take reasonable steps to provide him with medical assistance. Instead, the defendants contend, the record shows that they did take reasonable measures to address Rowe's cataract condition and acted reasonably in deciding not to authorize surgery to remove the cataract. Rowe relies on Dr. Hogan's diagnosis and recommendation that he have cataract surgery to show that the defendants knew of his need for surgery and deliberately ignored a substantial risk to his health by failing to authorize and provide the surgery.

If Dr. Hogan's diagnosis and recommendation were the only medical opinion in the record, Rowe would have a strong case. The record establishes that Rowe had a dense traumatic cataract in his right eye caused by an accident twenty years earlier. Dr. Hogan recommended that Rowe have surgery to prevent phacolytic glaucoma. Dr. Brown and Dr. Jacobs agreed with the diagnosis of traumatic cataract, but found that the eye was stable and did not need immediate surgery. Dr. Brown and Dr. Jacobs recommended a B-scan ultrasound test to determine the possible benefit of surgery and monitoring of the condition of the eye. Dr. Shingleton also found that the eye was stable and that there was no rush for surgery. Rowe was examined as the doctors recommended until he was released on bond.

15

The record shows that the defendants reacted appropriately to Dr. Hogan's recommendation for surgery by authorizing surgery and progressing toward scheduling the procedure. The delay between Nurse Butler's initial request for authorization to the correct address in mid-March and the authorization in mid-May does not demonstrate the defendants' deliberate indifference to a serious medical need. At worst, given the lack of urgency for the health care requested, the delay in responding to Nurse Butler's request by the Division of Immigration Health Services might suggest negligence.

Although Rowe faults Wacha and Rivera for changing their minds after Dr. Brown's examination and opinion that surgery was not then necessary, and for continuing to deny authorization based on Dr. Jacobs' and Dr. Shingleton's subsequent similar opinions, the record does not show that their decision was due to their deliberate indifference to a serious medical need. Wacha states in his declaration that he sought a doctor to provide the surgery who was closer to the Hillsborough jail where Rowe was being held, not that he sought another opinion to avoid the surgery recommended by Dr. Hogan, which Wacha and Rivera had already authorized. Despite the inconsistencies in the record pertaining to the reasons for transferring Rowe from Merrimack to Hillsborough, the evidence does not support an inference that

16

Rowe was transferred to avoid the recommended and authorized surgery.

Based on the evidence provided for summary judgment, it is undisputed that Rowe received medical attention pertaining to his cataract condition, although he did not receive surgery to remove the cataract. The record shows a difference of opinion among the doctors that examined Rowe as to the appropriate course of treating the cataract. Disagreement among medical professionals as to the proper course of treatment does not give rise to a constitutional violation. See Watson v. Caton, 984 F.2d 537, 540 (1st Cir. 1993); Sires v. Berman, 834 F.2d 9, 13 (1st Cir. 1987).

The defendants' reliance on the opinions of the doctors who examined Rowe after Dr. Hogan recommended surgery and who believed that his condition was not urgent does not constitute deliberate indifference to a substantial risk to Rowe's health. Since Rowe has not demonstrated a trialworthy factual issue on his claim that the defendants violated his due process rights by not immediately authorizing surgery for his cataract, the defendants are entitled to summary judgment.

B.  Eye Glasses

Rowe also contends that the defendants were deliberately indifferent to his serious medical need for eye glasses both to

17

correct his vision and to protect his left eye from injury.  Rowe relies on Dr. Hogan's suggestion that Rowe be provided with eye glasses to be worn full time to improve and protect his vision in his left eye.  He faults Wacha and Rivera for not authorizing eye glasses for him as Dr. Hogan suggested, and he argues that the eye glasses that were eventually provided did not comply with Dr. Hogan's suggestion or Dr. Jacobs' prescription.

A medically documented need for eye glasses that is known by the defendants and ignored may give rise to a claim that the defendants were deliberately indifferent to the plaintiff's serious medical need.  See Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996).  In this case, Dr. Hogan suggested, on February 27, 1998, that Rowe wear full-time glasses to protect and improve his vision in his left eye, but he did not prescribe such glasses. It appears that Nurse Butler, from Merrimack County, only requested authorization for cataract surgery, based on Dr. Hogan's recommendation.  Since Butler is not a defendant, any failure on her part to request an authorization for glasses is not actionable against the defendants in this case.

Dr. Hogan's recommendation, including the suggestion for glasses, was attached to Nurse Butler's request to the Division for Immigration Health Services for authorization of cataract surgery.  Since Dr. Hogan did not provide a prescription for the

18

glasses, his suggestion did not show a medical need that mandated treatment.  There is no evidence that Wacha, Rivera, or any of the defendants were subjectively aware that Rowe had a serious medical need for glasses and deliberately ignored it.  Therefore, based on the record presented for summary judgment, the defendants' response to Dr. Hogan's suggestion was at most negligent, rather than deliberately indifferent.

On June 23, 1998, Rowe was examined by Dr. Brown who determined that he had no vision deficiency in his left eye.  Dr. Brown made no recommendation that Rowe wear glasses to protect his vision in the left eye.  Since no deficiency was found and no recommendation was made for glasses, no request was made for an authorization for glasses.  When Rowe was examined on November 11, 1998, Dr. Jacobs reported that "[h]is intermittent difficulty with near/reading vision can be alleviated with a reading spectacle, for which I have given him a prescription."  Defs. Ex. 3, att. D.  Dr. Jacobs did not recommend or prescribe full-time glasses to protect Rowe's vision in his left eye.  Later, at the preliminary injunction hearing on June 30, 1999, Dr. Jacobs testified that he would recommend that Rowe wear protective goggles when engaging in hazardous activities but did not recommend full-time prescription glasses.

On November 16, 1998, the INS provided Rowe with reading

19

glasses that may have been over-the-counter magnifying glasses or may have been lenses made according to Dr. Jacobs's prescription. Dr. Jacobs testified that either type of lens would correct Rowe's slight vision deficiency for reading. The reading glasses could not be worn full time, but Dr. Jacobs did not recommend full-time prescription glasses. After Rowe was released on bond, he was given a prescription for bifocal protective lenses that could be worn full time. Dr. Murphy's prescription, even if it indicated a serious medical need, was provided after Rowe was released from INS custody and, therefore, does not affect the analysis of the information known to the defendants while Rowe was in custody.

Since the defendants provided glasses that met the requirements of Dr. Jacobs' prescription, and since Dr. Brown found no vision deficiency and did not prescribe glasses in the interim between Dr. Hogan's suggestion and Dr. Jacob's prescription, the record evidence does not support Rowe's claim that the defendants were deliberately indifferent to a serious medical need for eye glasses. As Rowe has not shown a trialworthy issue as to his Fifth Amendment claim based on his need for eye glasses, the defendants are entitled to summary judgment. Because the defendants are entitled to summary judgment on the merits, it is not necessary to consider their

defense of qualified immunity.

Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (document no. 43) is granted.  The clerk of court shall enter judgment accordingly, and close the case.

SO ORDERED.

                                        _____
                                        Joseph A. DiClerico, Jr.
                                        District Judge

June 15, 2000

cc:  David B. Rowe, pro se
     T. David Plourde, Esquire