178 F.3d 28,
Shawn GIROUX, Plaintiff, Appellant,
v.
SOMERSET COUNTY, Fred Hartley, and Barry DeLong, Defendants,
Appellees.
 No. 98-1770.
 United States Court of Appeals,
First Circuit.
 Heard Dec. 10, 1998.
Decided May 24, 1999.
 
 Michael J. Schmidt, with whom Peter T. Marchesi was on brief for appellant.
 Edward R. Benjamin, with whom Michael R. Bosse was on brief for appellees.
 Before SELYA, Circuit Judge, GIBSON, Senior Circuit Judge,* and LIPEZ, Circuit Judge.
 LIPEZ, Circuit Judge.
 
 
 1
 Shawn Giroux, a former inmate at the Somerset County Jail, brought suit pursuant to 42 U.S.C. § 1983 against one prison employee (Sergeant Hartley), Somerset County Sheriff Barry DeLong, and Somerset County after he was assaulted by another inmate. Giroux alleges a violation of the Eighth Amendment prohibition of "cruel and unusual punishments" and pendent state claims pursuant to the Maine Tort Claims Act, Me.Rev.Stat. Ann. tit. 14, § 8101 et seq. The district court granted a summary judgment to all defendants on the § 1983 claims and dismissed the state law claims without prejudice. We reverse the judgment of the district court.
 
 I.
 A. Facts
 
 2
 We present the facts from the summary judgment record in the light most favorable to Giroux, the non-moving party, and draw all reasonable inferences in his favor. See Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir.1994). Giroux was incarcerated in the Somerset County Jail in September 1995.[1] On September 19, 1995, Deputy Doug Manson informed Giroux that a detective from the Somerset County Sheriff's Department wanted to speak with Giroux. Manson escorted Giroux from his cell to meet with the detective. Robert Tucker, an inmate with whom Giroux shared a common day room,[2] threatened Giroux in the presence of Manson upon hearing that Giroux was going to meet with the detective. Robert Tucker apparently thought that Giroux was going to be asked for information about Tucker. After meeting with the detective, Giroux was escorted to a new cell; his belongings had been collected and moved for him. Although no reason for Giroux's September 19th cell change is reflected in the jail's records, it is a fair inference that Giroux was relocated in response to Robert Tucker's threats.
 
 
 3
 The next day, September 20, 1995, Robert Tucker again threatened Giroux as he was taken past Robert Tucker's cell on his way to breakfast. While at breakfast, Scott Tucker, Robert Tucker's brother, sat down at a table with Giroux and communicated a veiled threat to Giroux and two other inmates, Tony St. Pierre and Wayne Curtis, telling them that they were lucky that his brother Robert Tucker was "on the other side of the glass" or "on the opposite side of the window" (referring to the fact that they were separated from Robert Tucker during breakfast). Following breakfast on September 20th, Scott Tucker and other inmates who Giroux believed were in association with Robert and Scott Tucker passed by Giroux's cell and threatened Giroux, telling him "you're dead."
 
 
 4
 Later that day Giroux and fellow inmates St. Pierre and Curtis met with Jail Administrator Judith Thornton and, according to Giroux, requested protective custody due to the Tucker brothers' threats.[3] Although Thornton testified in her deposition that she has no recollection of such a meeting, jail records indicate that Giroux was placed on cell feed status on September 20, 1995, and Giroux is listed in jail records as being on cell feed status again on September 21, 1995. There is no policy in the record governing the use of cell feed status to protect inmates. Nevertheless, every employee deposed testified to the practice of using cell feeding as a protective device. Indeed, according to that testimony, the only reasons for an inmate to be placed on cell feed status are (1) health related or (2) as a form of protective custody from other inmates. Jail employees, including co-defendant and shift supervisor Sergeant Fred Hartley, testified that the inmate roster should have indicated the reason for Giroux's cell feed status. Although no reason for cell feeding Giroux is recorded in the jail's records, it is a fair inference that he was being cell fed because of threats against him.
 
 
 5
 Co-defendant Sergeant Fred Hartley was the shift supervisor on the evening and night of September 21, 1995. Giroux and eight or nine other inmates participated in the jail's visitation period that evening. After Giroux had been in the common visiting room for some time,[4] Scott Tucker was brought into the same visitation room. The record does not establish who escorted Giroux and Scott Tucker into the visitation room. According to policy, all the prisoners are subjected to a strip search after participating in visitation and before being returned to their cells. The inmates wait for this search in a holding cell in which they are under observation through a plexiglass window. No prison guards are physically present. After an argument began between Scott Tucker and another inmate in the holding cell, the other inmate was escorted out of the holding cell. Immediately thereafter, Scott Tucker began an argument with Giroux, and they exchanged words. Scott Tucker then physically assaulted Giroux, causing a broken nose, torn shoulder ligaments, and a head laceration which required stitches to close. Because Hartley was close by, distributing medication to other inmates, he was the first person to break up the fight between Scott Tucker and Giroux.
 
 
 6
 Additional facts will be referenced when relevant to the discussion.
 
 B. Procedural History
 
 7
 In a complaint filed on September 8, 1997 alleging violations of 42 U.S.C. § 1983[5] and the Maine Tort Claims Act, Me.Rev.Stat. Ann. tit. 14, § 8101 et seq., Giroux claimed that Sergeant Fred Hartley, Somerset County Sheriff Barry DeLong, both of whom were sued in their individual and official capacities, and Somerset County had deprived him of his right to be free of cruel and unusual punishment in contravention of the Eighth Amendment to the United States Constitution.[6] Specifically, Giroux claimed that the defendants had violated his right to be protected against attacks by other inmates.
 
 
 8
 The district court, adopting the findings and conclusions of the magistrate judge, held that the evidence that Sergeant Hartley had violated Giroux's Eighth Amendment rights was insufficient and granted all defendants a summary judgment on the § 1983 claims. Although acknowledging a fair inference that Sergeant Hartley knew that Giroux was on cell feed status, the court noted that the Eighth Amendment requires an actual, subjective appreciation of a risk of harm in order to hold prison officials liable under the Cruel and Unusual Punishments Clause of the Eighth Amendment, and that Giroux had "presented no facts that Hartley knew of the threats to [Giroux's] life, or that those threats were made by an inmate who was in the holding cell with [Giroux]." Turning to Giroux's claims against the Sheriff and the County, and construing those claims as alleging a failure to train Sergeant Hartley, the court stated that it was "satisfied that Defendant Hartley did not violate [Giroux's] Eighth Amendment rights," and therefore concluded that "no liability can attach to Somerset County or Defendant [Sheriff] DeLong for failing to properly train or supervise [Hartley]." The court then dismissed the state law claims without prejudice. Giroux now appeals those decisions.
 
 II.
 
 9
 A. The Cruel and Unusual Punishments Clause of the Eighth Amendment
 
 
 10
 The Eighth Amendment prohibits "cruel and unusual punishments," and "it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.' " Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Helling v. McKinney, 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)).[7] Prison officials have a duty to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " Id. (quoting Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). That duty has its origins in the forced dependency of inmates: "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." Id. at 833 (internal quotations and brackets omitted). Therefore, under the Eighth Amendment, "prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners." Id. (quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.1988)).
 
 
 11
 However, not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to an Eighth Amendment claim. In order for a prison-conditions complaint[8] to state a violation of the Eighth Amendment, two requirements must be met. First, the alleged deprivation of adequate conditions must be objectively serious, i.e., "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. at 834. Second, the official involved must have had "a sufficiently culpable state of mind," Wilson v. Seiter, 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), described as "deliberate indifference" to inmate health or safety. Farmer, 511 U.S. at 834.[9] In this context, "deliberate indifference" means that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." Id. at 837. This standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness. See id. at 839-40 (holding that "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment"); see also id. at 837-38 (citing to Model Penal Code § 2.02(2)(c) and noting that criminal recklessness requires a person to "consciously disregar[d] a substantial risk of serious harm"). While the Supreme Court has admonished the lower courts to "be careful to ensure that the requirement of subjective culpability is not lost," id. at 843 n. 8,
 
 
 12
 [w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.
 
 
 13
 Id. at 842 (internal citation omitted). Even if prison officials know of a substantial risk to inmate health or safety but fail to prevent the harm, they "may be found free from liability if they respond reasonably to the risk." Id. at 844. With these standards in mind, we turn to the claim against Sergeant Hartley.
 
 B. Sergeant Hartley
 
 14
 In assessing the claim against Sergeant Hartley, we must determine whether a reasonable juror, on the basis of the summary judgment record, could conclude that Hartley "kn[ew] that [Giroux] face[d] a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. Consistent with the magistrate judge's recommendation, the district court assumed that a substantial risk of serious harm had been shown but concluded that there was insufficient evidence to support an inference of Hartley's actual knowledge of the risk, and granted a summary judgement. We disagree with the court's analysis of the summary judgment record.
 
 
 15
 1. Knowledge of a Substantial Risk of Serious Harm
 
 
 16
 According to Hartley's own testimony, cell feed status indicated either that the prisoner had a health problem or that the prisoner was in protective custody. Hartley also testified that one of his responsibilities as shift supervisor was to review the cell block assignment roster each day at the start of his shift. A juror could reasonably conclude, therefore, that Hartley performed this obligatory administrative task on September 21, 1995, thus alerting him at the very least to the fact that Giroux was on cell feed status, and that one of the two explanations for that cell feed status involved the risk that Giroux could be harmed by another inmate.
 
 
 17
 As Farmer instructs, Hartley did not have to know the identity of the particular person threatening Giroux in order to have actual knowledge of the risk. See Farmer, 511 U.S. at 843 ("[A] prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."). If Hartley understood that there was a high probability of a danger to Giroux, he
 
 
 18
 would not escape liability if the evidence showed that he merely ... declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation ... ).
 
 
 19
 Id. at 843 n. 8. In our view, the summary judgment record supports the inference that Hartley was aware of a high probability that Giroux was vulnerable to attack from another inmate but took no action despite that awareness.
 
 
 20
 2. Deliberate Indifference to the Known Risk
 
 
 21
 The next inquiry, then, is whether Hartley's inaction in the face of the known risk evinced the culpability required for an Eighth Amendment violation. Prison officials "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844. The record discloses no circumstances that constrained Hartley from responding reasonably to protect Giroux: no time pressure, no lack of resources, no competing concerns whatsoever. See, e.g., id. at 835 (distinguishing claims alleging excessive use of force by prison guards because in that context the alleged actions of prison officials are generally taken "in haste, under pressure, and frequently without the luxury of a second chance") (quoting Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)). Hartley acknowledged that he was obliged to find out the reason for cell feed status when the cell block assignment roster did not contain that information, but he claimed that this information was for his own edification and that he had no responsibility, as shift supervisor, to disseminate that information to the subordinates on his shift. Other prison employees, including two subordinates who were working the night Giroux was attacked by Tucker, testified that it was the responsibility of the shift supervisor to tell them about any inmates who were being cell fed for protective purposes when such protective purposes were not listed on the inmate roster.
 
 
 22
 On this record, therefore, there is a genuine and material factual dispute about the scope of Hartley's responsibility as shift supervisor. In resolving that dispute, a reasonable juror could find that it was Hartley's responsibility as shift supervisor to confirm the basis for the cell feeding of each inmate in cell feed status and to alert the employees on his shift to that basis, in order to reasonably protect the inmates in his custody. A juror could find that Hartley's abdication of his responsibility, in the face of such a known danger to Giroux's safety, was a reckless dereliction of duty rising to the level of Eighth Amendment deliberate indifference. "When a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for a prisoner's safety." Pinto v. Nettleship, 737 F.2d 130, 132 (1st Cir.1984) (discussing deliberate indifference in the context of supervisory liability under § 1983) (internal quotations omitted). The court erred in ruling that the summary judgment record could not support a finding that Hartley was deliberately indifferent to Giroux's safety.
 
 C. Sheriff DeLong and Somerset County
 
 23
 Having found for Hartley on the defendants' motion for summary judgment, the district court summarily concluded that the Sheriff and the County could not be liable for deficient policies or for a failure to train. Because the district court premised its grant of summary judgment for the Sheriff and the County on Hartley's exoneration, that determination, too, must be vacated and the plaintiff's claims against all three defendants reinstated for further proceedings.[10]
 
 
 24
 Judgment vacated. The case is remanded to the district court for further proceedings consistent with this opinion.[11] Costs to appellant.
 
 
 
 *
 Of the Eighth Circuit, sitting by designation
 
 
 [1]
 Giroux began serving a 34-day sentence for breaking and entering on September 6, 1995
 
 
 [2]
 Cells in the jail accommodate two inmates. Each cell is connected to one other cell by a day room which is shared by all four inmates
 
 
 [3]
 The defendants claimed, and continue to argue here, that prisoners may only request protective custody in writing and that no prisoner may be placed in protective custody without such a written request, absent extenuating circumstances. In contrast, the jail's D-243 policy covering "Special Management Inmates" simply refers to inmates in protective custody "at the request of the inmates or the jail staff." We need not determine whether Giroux formally requested protective custody because there is ample evidence from which a jury could conclude that he was, in fact, granted a form of protective custody
 
 
 [4]
 There was conflicting testimony as to whether a prisoner on cell feed status should be in a group visitation room with other inmates. There is no jail policy on this point in the record
 
 
 [5]
 Title 42 U.S.C. § 1983 provides in relevant part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in action at law, suit in equity, or other proper proceedings for redress.
 
 
 [6]
 The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."
 
 
 [7]
 The Eighth Amendment applies to state action through the Fourteenth Amendment. See Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962)
 
 
 [8]
 See Farmer, 511 U.S. at 832; Wilson v. Seiter, 501 U.S. 294, 303, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (characterizing "the protection [a prisoner] is afforded against other inmates" as a "condition of confinement")
 
 
 [9]
 We are aware that the cases have used the term "wantonness" to describe the culpability required for an Eighth Amendment violation. See Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 303. However, as Wilson makes clear, whether an official's acts can be considered "wanton" is a contextual inquiry, depending on the type of claim and the constraints facing the official. Wilson, 501 U.S. at 303; see also Hudson v. McMillian, 503 U.S. 1, 5, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) ("What is necessary to establish an 'unnecessary and wanton infliction of pain' ... varies according to the nature of the alleged [Eighth Amendment] violation.") (quoting Whitley v. Albers, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)). Farmer is the controlling precedent for the type of conditions-of-confinement claim at issue in this case and we therefore use the "deliberate indifference" standard as therein articulated. See Farmer, 511 U.S. at 835-44
 
 
 [10]
 We do not necessarily agree with the district court that the Sheriff's or the County's liability depends upon Sergeant Hartley's liability for a constitutional violation. Any such determination requires a more complete development of the facts. See e.g., Helling v. McKinney, 509 U.S. 25, 32-34, 113 S.Ct. 2475, 125 L.Ed.2d 22 (recognizing a policy-based Eighth Amendment claim against prison officials because the Eighth Amendment "requires that inmates be furnished with the basic human needs, one of which is reasonable safety") (internal quotation marks omitted); (Jensen v. Clarke, 94 F.3d 1191 (8th Cir.1996)) (affirming finding against director of state prison system and warden of state prison on the basis of inadequate prison safety policies); Walsh v. Mellas, 837 F.2d 789 (7th Cir.1988) (affirming finding that prison officials "devised and operated" a deficient security system for prisoners in "investigative status" even though subordinate prison guards were found not to have violated the plaintiffs' constitutional rights)
 
 
 [11]
 After granting a summary judgment to all defendants on the federal claims, the district court refused to exercise pendent jurisdiction over the state law claims and dismissed them without prejudice. Given our conclusion that granting a summary judgment for the defendants was an error, the district court must revisit the appropriateness of hearing the related state law claims