# United States Court of Appeals

## For the First Circuit

No. 02-1504

STEPHEN BURRELL,

Plaintiff, Appellant,

v.

HAMPSHIRE COUNTY; FRANK GODEK, individually and in his official capacity as corrections officer for the Hampshire County Jail/House of Corrections; ANTHONY THOMAS, individually and in his official capacity as corrections officer for the Hampshire County Jail/House of Corrections; JOHN A. SEAVER, individually and in his official capacity as corrections officer for the Hampshire County Jail/House of Corrections; ROBERT GARVEY, individually and in his official capacity as county sheriff for Hampshire County; and WILLIAM A. MARTINEZ, individually and in his official capacity as corrections officer for the Hampshire Jail/House of Corrections,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,
Bownes, Senior Circuit Judge,
and Lynch, Circuit Judge.

Michael J. Schmidt, with whom Wheeler & Arey was on brief, for appellant.
Charles M. Maguire, Special Assistant Attorney General, for appellees.

October 4, 2002

**LYNCH**, **Circuit Judge**. Stephen Burrell was assaulted and severely beaten by David Allen, a fellow inmate, on December 2, 1997 while they were both pretrial detainees at the Hampshire County Jail/House of Corrections ("the Hampshire Jail"). Burrell brought a damages action under 42 U.S.C. § 1983 (2000) against certain jail employees and Hampshire County Sheriff Robert Garvey. He alleged that defendants had been deliberately indifferent to his health and safety, in violation of his Fourteenth Amendment Due Process rights as a pretrial detainee. Burrell also asserted that the Hampshire Jail's failure to classify and segregate violent and nonviolent inmates itself violated the Eighth Amendment. The district court granted summary judgment to the defendants on both claims. Burrell appeals that decision. We affirm.

## I. Facts

Our review of a grant of summary judgment is de novo. We present the facts from the summary judgment record in the light most favorable to Burrell, and draw all reasonable inferences in his favor. See Conto v. Concord Hosp., Inc., 265 F.3d 79, 80 n.1 (1st Cir. 2001). Summary judgment is warranted if a jury could not reasonably return a verdict in the plaintiff's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accordingly, we accept as true the facts alleged by the plaintiff in his complaint, drawing all reasonable inferences in his favor.

Burrell was incarcerated at the Hampshire Jail on March 7, 1997 while awaiting trial on federal mail fraud, wire fraud and fictitious name charges. Allen, meanwhile, had been incarcerated

in the Hampshire Jail since May 5, 1996 while awaiting trial on murder and assault charges. Allen and Burrell had been on the same cell block since August 26, 1997.

The Hampshire Jail has three cell blocks. Cell Block A, where Burrell was held, has twelve cells on each of two tiers, for a total of twenty-four cells. Inmates have individual cells, which they are able to lock from the inside. Inmates also have some level of choice regarding their location; when cells become open, they can request to move within their cell block. Early in his stay at the Hampshire Jail, Burrell requested a particular cell with a view of an adjacent forest, because he "wanted a room where [he] could see the free world." Burrell was given this cell, and it can be inferred that he was reluctant to give up his cell with a view.

Much of Burrell's claim rested on what he said were Allen's known and demonstrated violent proclivities. Allen was involved in several earlier incidents and was disciplined by prison officials at least three times. Two of the incidents for which Allen was disciplined involved violent altercations with other inmates. We list the incidents which, it can be inferred, were known to the corrections officers.

1. On December 16, 1996, a corrections officer overheard Allen telling another inmate that if Allen saw an inmate named Robles, he would hurt him, saying "If I see that mother fucker I'm gonna kill him. He better stay locked! He's a deadman," and punching the air with his fist. Allen was not disciplined for

this.

2. The following day, December 17, 1996, Allen punched another inmate, James Peterson, after a disagreement growing out of Peterson's complaints that Allen's music was too loud. When Peterson was taken to the hospital for treatment of his injuries, he told staff that he had been hit with a steel bar. According to the report filed on the disciplinary hearing, Allen claimed that he hit Peterson because Peterson called him a "nigger," and this account was supported by the testimony of a witness. Allen was found guilty of violating Hampshire Jail Code 18 (fighting with, assaulting, or threatening another person) and received seven days of isolation. Allen also pled guilty to criminal charges for this incident.

3. On March 20, 1997, Allen was disciplined for involvement in a fight between two other inmates. Allen claimed that he was only breaking up a fight. His claim was supported by witnesses, although one of those involved in the fight said that Allen was an active participant. For his involvement, Allen received seven days of room restriction suspended for sixty days, and four days of room restriction with a credit for time served.

4. On August 15, 1997, Allen and other inmates carried Raul Munier, also an inmate, to the day room and stuffed him in a trash can. Munier was not injured, but Allen and the other perpetrators were sanctioned for horseplay.

5. During the time they were blockmates, Burrell saw Allen fighting with other inmates, including a dispute with another

-4-

inmate named David Santiago.  According to Burrell, Allen removed a shower curtain rod and beat Santiago about the face and chest. Prison officials also noted another dispute between Allen and Santiago in November 1997.

In addition, it can be inferred that Allen had probably engaged in more disruptive behavior than just the listed incidents, as evidenced by his peripatetic circuit through the Hampshire Jail's three cell blocks.  Allen was moved from Cell Block C to Cell Block B on May 27, 1997, and then from Cell Block B to Cell Block A on August 26, 1997.  Prison officials admit that disciplinary infractions are one reason for moving inmates.

From August 26, 1997 until the date of the incident, December 2, 1997, Allen and Burrell lived one cell apart on the second tier of Cell Block A.  While no disciplinary sanctions were imposed for altercations between Allen and Burrell, there were several incidents.  Burrell brought at least two of these three incidents to the attention of Hampshire Jail officials:

1. Burrell and Allen had a disagreement when Allen changed the channel on the television in the day room to the Black Entertainment Television channel; Burrell, who had been watching another station, said that he didn't want to change the channel, and Allen responded, "What up."  Burrell then returned to his cell.

2. During the summer, Allen pushed his way through a line of inmates waiting to go outside to the recreation yard.  Burrell told him to wait his turn.  Once they were both outside, Allen grabbed Burrell by the arm and said "You motherfucker.  Dis me

again like that, and I'll hurt you." Burrell responded, "Yeah right," and walked away from Allen. Burrell reported this incident to Officer Anthony Thomas within a day or so.

3. Less than a month before the December assault, Burrell and Allen were in the gymnasium together. Burrell was sitting on a bench after playing basketball, and Allen joined him on the bench and then accused Burrell of sweating on him. Burrell got up and walked away, going up a staircase. Allen pushed Burrell, causing him to grab the railing, but not hard enough to make Burrell fall. Burrell again reported the incident to Thomas.

In addition to these incidents, Allen's habit of playing his radio loudly and late at night created tension between Allen and Burrell. According to Burrell, "David had a large boom box radio and he would turn it and turn it up. And myself and others would complain to David Allen and he would say, 'This is my box and these are my tunes and fuck you.'"[1]

Burrell reported these incidents, and his concerns about Allen, to prison officials on a number of occasions. While the substance of these conversations is disputed, prison officials were clearly aware of tension between the two men. We are, in any event, required to accept Burrell's version as true for summary

---

[1] Prison officials say that they perceived Burrell's desire to have Allen removed from Cell Block A as stemming from Burrell's racism. Burrell is white; Allen is African-American. Thomas says that Burrell referred to Allen and others as the "jungle creatures," and that Martinez said that Burrell was trying to remove non-whites from his cell block. Burrell disputes this.

judgment purposes.

Burrell spoke to Thomas after the recreation yard incident, and said that he was afraid that there was going to be a fight between Allen and him. Burrell admits that he did not ask for protective custody at that time. After the incident in the gymnasium, Burrell again spoke to Thomas, this time in an area called the "press room." Thomas responded that he had sent a memo to Garvey and Frank Godek, a superintendent at the Hampshire Jail, about the situation. Burrell complained that Allen was a disruptive influence, and requested that Allen be moved; according to Burrell, Thomas said, "We've already moved him all over the place. There are no more places to move him."

Burrell also discussed Allen with Lieutenant John Seaver on several occasions. Burrell told Seaver that "a fight is going to ensue. There [is] going to be blood. Somebody's going to get hurt." Again, he asked that Allen be transferred out of Cell Block A. According to Burrell, Seaver responded, "We're at a loss, we've moved him everywhere."

William Martinez, the corrections officer in charge of Cell Block A, also remembers discussing Allen with Burrell. According to Martinez, Burrell wanted Allen moved out of the block because Allen played his radio too loudly. Martinez recalls offering Burrell either the option of moving elsewhere, or protective custody. Martinez concedes that protective custody is not usually offered for conflicts as simple as complaints about a loud radio. Burrell denies he was given either option. Martinez's

statement is evidence of his knowledge that there was a conflict between Burrell and Allen that exceeded routine dimensions.

Burrell spoke about Allen to Godek as well. When Burrell was arranging to have a word-processor in his cell, he told Godek that Allen was "a bully" and that Allen had caused him problems.[2]

Burrell told Seaver and Thomas that he had earned a black belt in martial arts, and that he had received the Congressional Medal of Honor. Burrell admits that he lied to prison officials about his ability to take care of himself. Thomas says he believed Burrell, and testified that he worried for the safety of other inmates should Burrell attack them.

Finally, Burrell's wife, Deborah Burrell, also spoke to Thomas about tensions in Cell Block A. In her deposition, she described her conversation with Thomas as "not so much about assaulting, just that there was a commotion . . . that [Allen] was a very disagreeable fellow." She asked them either to talk to Allen or move him out of Cell Block A.[3] She did not ask for

_____

[2] Burrell also asserts that he wrote letters to Garvey and Godek, describing the situation and asking that Allen be transferred out of Block A. These letters were not produced by Burrell's counsel and placed into the summary judgment record, and, as a result, are not before us.

[3] Deborah Burrell also recounted conversations with her husband in which she suggested that he request a transfer; according to her, his response was "No, he didn't want to," because "[h]e didn't think it was fair." While these conversations were privileged under the Massachusetts spousal communication disqualification, Mass. Gen. Laws ch. 233, § 20 (2002), applied in federal proceedings through Fed. R. Evid. 501, defense counsel conceded at oral arguments that they had not made timely objections. Because of their hearsay nature, however, we do not consider the spousal conversations here as

-8-

protective custody for her husband.

On the day of the assault, Burrell had received a warning from another inmate that Willie Brown, a friend of Allen's, thought Burrell was providing information against him, and that Burrell should stay away from Allen. After lunch that day, Burrell was sitting in his cell with his shoes off. Allen came to Burrell's cell and said, "Burrell, I want to talk to you." Despite the earlier warning, Burrell "took it sort of as a peace offering," put his shoes on, and followed Allen back to his cell. Burrell explains this lapse of judgment by saying he thought he was on his own, the jail officials would do nothing to help him, and he had to try to work things out with Allen. Even though he saw Willie Brown waiting outside Allen's cell and wondered, "Why is he here? He doesn't ever come up here," Burrell still entered the cell. As Burrell entered the room, someone threw hot water in his face, blinding him. According to Burrell, he was hit from behind, collapsed onto the floor, and then Allen beat him repeatedly with a black stick and the bed frame.

Another inmate brought a correction officer to Allen's cell, ending the beating. Burrell was found with a "significant amount of swelling, redness and blood" on his face. Allen's floor was soaked with Burrell's blood, and Burrell's blood was on Allen's sheets and clothing. After receiving initial medical care from

evidence of whether Burrell sought protective custody. <u>See</u> <u>Garside</u> v. <u>Osco Drug, Inc.</u>, 895 F.2d 46, 49-50 (1st Cir. 1990) (hearsay evidence inadmissible at trial cannot be considered on a motion for summary judgment).

nurses at the Hampshire Jail, Burrell was taken to Cooley Dickinson Hospital for treatment.  We are told that Burrell suffered a broken nose and orbital bone, and a concussion.

## II. Analysis

Burrell brings suit against Godek, Thomas, Seaver, Garvey and Martinez in both their individual and official capacities for deliberate indifference to a risk to his health and safety.[4]  We evaluate his claims against the defendants in their individual capacities only.  A damages suit against an official in an official capacity is tantamount to a suit against the entity of which the official is an agent (the jail), and there is no claim here that the entity followed a policy or custom of deliberate indifference. Hafer v. Melo, 502 U.S. 21, 25 (1991); Kentucky v. Graham, 473 U.S. 159, 165-66 (1985).  Burrell also brings suit against Garvey and Hampshire County based on a failure to supervise, and on the Hampshire Jail's policy of not classifying and segregating inmates according to whether they were accused of violent or nonviolent offenses.  We discuss individual and municipal liability separately.

---

[4] It is doubtful whether there is enough evidence of involvement against Garvey to survive summary judgment.  Burrell claims to have notified Garvey of problems with Allen in a letter which is not before this court.  While we make all inferences in Burrell's favor, Burrell's testimony as to the letter would be prohibited under the best evidence rule.  Burrell produces no other evidence that he spoke to or otherwise notified Garvey of the risk posed by Allen.  Regardless, for the sake of argument, we consider Burrell's claim against Garvey in his individual capacity together with his claims against Godek, Martinez, Seaver and Thomas, each of whom, Burrell says, discussed the situation in Cell Block A with him personally.

A. Deliberate Indifference

Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases. See Bell v. Wolfish, 441 U.S. 520, 545 (1979) (the Due Process Clause protections are at least as great as those under the Eighth Amendment); 1 M.B. Mushlin, Rights of Prisoners §2.02 (2d ed. Supp. 2001) (same). An alleged Eighth Amendment violation is analyzed according to the framework laid out in Farmer v. Brennan, 511 U.S. 825 (1994), as further explicated in Giroux v. Somerset County, 178 F.3d 28 (1st Cir. 1999), and Calderón-Ortiz v. Laboy-Alvarado, 300 F.3d 60 (1st Cir. 2002).

Prison officials have a responsibility not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners. Farmer, 511 U.S. at 833 ("Having incarcerated persons with demonstrated proclivities for antisocial, criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.") (internal quotations omitted).

Not every injury suffered by a prisoner at the hands of another results in constitutional liability on the part of prison officials. Id. at 834. In Farmer, the Court established that only "deliberate indifference" by prison officials to an inmate's health or safety was sufficient to establish liability. The Farmer test

-11-

for Eighth Amendment violations initially establishes two tests. First, the deprivation alleged must be, objectively, sufficiently serious. Id. For a claim based on failure to prevent harm, the plaintiff must demonstrate he was incarcerated under conditions imposing a substantial risk of serious harm. Id. Second, the plaintiff must show that prison officials possessed a sufficiently culpable state of mind, namely one of "deliberate indifference" to an inmate's health or safety. Id. That state of mind is more blameworthy than negligence. Id. at 835.[5] The second prong of the Farmer test has subparts in turn.

The "deliberate" part of "deliberate indifference" was defined by the Supreme Court as requiring that a prison official subjectively "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. As said in Giroux, "[t]his standard, requiring an actual, subjective appreciation of risk, has been likened to the standard for determining criminal recklessness." 178 F.3d at 32. Within that subjective framework, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Id. In response, prison officials may show that even if the risks were obvious to others, it was not obvious to them.

The "indifference" part was also defined by the Supreme Court. Prison officials cannot be indifferent, of course, if they

---

[5] This case does not involve accusations that the prison officials themselves used excessive force. A different standard is used in these situations. Farmer, 511 U.S. at 835.

-12-

are unaware of the risk. But even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided. Farmer, 511 U.S. at 844. Conceivably, a response that was colorable and taken in good faith might still be enough to negate deliberate indifference even if it were inadequate from an objective standpoint (and thus negligent); but we need not pursue this issue since a reasonable response clearly defeats the claim of constitutional violation.

Our holding rests on the "indifference" part of the second prong of the Farmer test -- we hold that the officials responded reasonably to a known risk and so were not indifferent. Given the totality of the circumstances as understood by prison officials at the time, the defendants did not fail to take reasonable measures to avert potential harm. Even evaluating the record in the light most favorable to Burrell, the prison officials' behavior was not unreasonable when considered within the context of what they knew. Any inquiry into the reasonableness of the prison officials' actions "incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." Id. at 845 (internal quotations omitted). The focus is on what the jailers knew and what they did in response.

Burrell's assertions that he communicated to the defendants that there would likely be a fight and that there would be blood are taken as true. His concerns, though, were not the

-13-

only information the jail officials had. In addition, prison officials also received information from both Burrell and his wife which counteracted Burrell's expressed concerns and which influenced the officials' response to the risks. Burrell represented himself to officials as proficient in martial arts and as a decorated war hero. Prison officials reasonably could have believed that if tension between Burrell and Allen erupted, Burrell would not be defenseless. Indeed, Thomas said that this information led him to fear that Burrell might harm other inmates. Burrell also had never requested protective custody. He says his reasons were that he thought protective custody entailed moving the aggressor, in other words, Allen, out of the cell block. This is self-contradictory. Burrell both says that he did not seek protective custody and that he asked that Allen be moved. The focus is on what the corrections officers knew and whether they were deliberately indifferent. There is no evidence that they knew of Burrell's unique definition of protective custody. Deborah Burrell, meanwhile, went to prison officials to discuss the problem of Allen's music-playing and to request Allen's transfer. She did not seek either protective custody or a transfer for her husband. That she did not do so was something the jail officials could take into account, given her advocacy for him on lesser issues.

Prison officials also had to weigh Burrell's complaints against several significant lacunae. Allen, to their knowledge, had no motive to attack Burrell. Burrell was neither a rival gang member nor an informant. There was also no history of significant

altercations between Burrell and Allen over the four months they had been blockmates. Moreover, while Allen did have a history of assaults on other inmates, it had been nearly nine months since Allen had been disciplined for violent behavior.

The officials also knew that Burrell, his asserted martial arts prowess aside, could go into his cell and lock the door if he felt threatened by Allen. There was no basis for them to predict Burrell would walk into the lion's den and be mauled. The claimed failure here was that the prison officials neither transferred Allen nor put Burrell into the protective custody he never sought. Under the totality of circumstances known to the prison officials, no jury could reasonably find that the officials had responded unreasonably.

Giroux and Calderón-Ortiz do not help Burrell. In Giroux, jail officials inexplicably introduced a person posing a known danger, another inmate who had repeatedly threatened Giroux, into the holding cell where Giroux was being kept. They did so after taking actions which they appear to have known would tar Giroux as an informant and thereby increase the risk to him. Giroux, 178 F.3d at 29-30. Calderón-Ortiz, meanwhile, was evaluated under the more lenient standard for dismissal of claims under Rule 12(b)(6), not as a summary judgment issue. 300 F.3d at 62. In Calderón-Ortiz, moreover, prison officials failed to make their regular patrols of the housing areas, allowing a violent attack to go on for between half an hour and an hour. Id. at 63.

Summary judgment was appropriately entered on the claims that jail employees Godek, Thomas, Seaver, Garvey and Martinez were deliberately indifferent.

B. Claims Against Sheriff Garvey and Hampshire County

Burrell originally claimed that Sheriff Garvey was liable for both a failure to supervise and for inadequate training. He later dropped the claim of inadequate training, conceding that there was no basis for this claim. Burrell's failure to supervise claim against Garvey is doomed by his inability to establish that prison officials under Garvey's supervision violated his Eighth Amendment rights. The causal chain is broken. Nieves v. McSweeney, 241 F.3d 46, 50 (1st Cir. 2001); Evans v. Avery, 100 F.3d 1033, 1039 (1st Cir. 1996); Willhauck v. Halpin, 953 F.2d 689, 714 (1st Cir. 1991).

Burrell also claims municipal liability on the part of Hampshire County for having an unconstitutional custom or policy of failing to classify and segregate inmates. Municipal liability may be imposed under § 1983 when the enforcement of a municipal policy or custom was the moving force of a violation of federally protected rights. Bd. of the County Comm'rs v. Brown, 520 U.S. 397, 404 (1997). A policy may be facially constitutional, but municipalities will still be liable if the policy can be shown to produce constitutional violations. City of Canton v. Harris, 489 U.S. 378, 385-87 (1989). To establish liability, we look at whether there was a "direct causal link" between the policy and the violation, id. at 385, or if the policy "actually caused" the

-16-

violation, id. at 391; see also Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999) ("direct causal link").

The district court correctly held that the Hampshire Jail's policy of not screening and then segregating potentially violent prisoners from non-violent prisoners is not itself a facial violation of the Eighth Amendment. Burrell v. Hampshire County, No. Civ.A. 99-30269-MAP, 2002 WL 596210, at *6 (D. Mass. Apr. 10, 2002). Of course, as Calderón-Ortiz acknowledges, lack of a classification system may be part of an Eighth Amendment violation. 300 F.3d at 65-66. Burrell argues that Janes v. Hernandez, 215 F.3d 541 (5th Cir. 2000), should be persuasive in identifying lack of a classification system as an Eighth Amendment violation. But the differences between the situations at issue here and in Janes, where a traffic offender was confined in a single large cell with a number of known violent offenders, id. at 542, lead to precisely the opposite conclusion. The Hampshire Jail policy, in which inmates were housed in individual cells that they were able to lock from inside at any time, simply does not pose the level of danger described in Janes.

Nor was the policy the "actual cause" of Burrell's injury. As a factual matter, Burrell's cell could be locked from the inside, and he could have requested protective custody or transfer to another cell block. Burrell, 2002 WL 596210, at *6. Moreover, Burrell does not present evidence from which a jury could conclude that the Hampshire Jail's policy poses a substantial risk of harm to inmates. Burrell did not present evidence of a pattern

-17-

of harm to inmates going beyond his own assault.

Summary judgment was appropriately entered for defendants Garvey and Hampshire County.

For these reasons, the order of the district court granting summary judgment is **<u>affirmed</u>**.