

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LOIS GOODMAN, an individual,<br><br>      Plaintiff-Appellant,<br><br>  v.<br><br>CITY OF LOS ANGELES POLICE DEPARTMENT; DAVID PETEQUE, individually and in his official capacity as an employee of the Los Angeles Police Department; JEFFREY BRISCOE, individually and in his official capacity as an employee of the Los Angeles Police Department; NICK PIKOR, individually and in his official capacity as an employee of the Los Angeles Police Department; LOS ANGELES COUNTY DEPARTMENT OF CORONER; YULAI WANG, individually and in his official capacity as an employee of the Los Angeles County Coroner's Office; PAMELA PITCHER, Detective, Los Angeles Police Department,<br><br>      Defendants-Appellees. | No.   15-55757<br><br>D.C. No.<br>2:13-cv-05959-JAK-MAN<br><br>MEMORANDUM[*] |

Appeal from the United States District Court

---

    [*]     This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

for the Central District of California
John A. Kronstadt, District Judge, Presiding

Argued and Submitted February 9, 2017
Pasadena, California

Before:  SCHROEDER, PREGERSON, and MURGUIA, Circuit Judges.

Plaintiff Lois Goodman ("Goodman") appeals the district court's grant of summary judgment to individual Los Angeles Police Department ("LAPD") officers David Peteque, Jeffrey Briscoe, Pamela Pitcher, and Nick Pikor (collectively, "the officers"), Los Angeles County Coroner's Office deputy medical examiner Dr. Yulai Wang ("Dr. Wang"), and the LAPD in this action for unlawful arrest and malicious prosecution under 42 U.S.C. § 1983.  For the reasons explained below, we affirm the judgment of the district court with respect to the officers and the LAPD, but reverse the judgment of the district court with respect to Dr. Wang and remand for further proceedings.

Goodman was arrested for the murder of her husband Alan on August 21, 2012. Goodman had found her husband dead in their bed, covered in blood, with blood throughout the house, on April 17, 2012.  There was no sign of forced entry, and Goodman was the last person to see Alan alive.  Though the initial judgment on the scene was that Alan had likely died from an accidental fall, an initial autopsy  lead to a lengthy investigation by the LAPD with Goodman as the

2

primary, and only, suspect. On August 7, 2014, Dr. Wang changed the cause of death on Alan's autopsy report from "pending investigation" to "homicide" with no explanation for the change. Armed with the new autopsy report, LAPD officers obtained an arrest warrant with full extradition on August 14, 2012, because Goodman was to be in New York to referee the U.S. Open tennis tournament. Two LAPD officers then traveled to New York, arrested Goodman as she left her hotel, and the officers then appeared on a morning television show.

LAPD lab tests later revealed Goodman's DNA was not present on the coffee mug suspected to have been the murder weapon, and Goodman passed a polygraph test. The District Attorney ("DA") for Los Angeles retained two independent pathology experts, who both concluded that Alan's death was an accident, thereby discrediting Dr. Wang's conclusion. The DA dismissed the criminal case against Lois Goodman. Goodman then filed this suit against the officers, the LAPD, and Dr. Wang.

1. The district court did not err in granting summary judgment based on qualified immunity to the individual LAPD officer defendants on Goodman's claims of unlawful arrest and malicious prosecution. On appeal, Goodman disavows any reliance on a judicial deception theory and instead argues a garden variety false arrest claim, i.e., that the warrant affidavit the individual officers filed

was so lacking in probable cause that no reasonable officer would have filed the warrant application. *See Malley v. Briggs*, 475 U.S. 335, 345 (1986).

Goodman first argues that because the warrant affidavit itself contained no list of facts, but instead incorporated "5 Books" of evidentiary material by reference, it was lacking in probable cause. Goodman cites no case law suggesting that a sworn affidavit cannot rely entirely on incorporation by reference of other documents and there appears to be no clearly established law prohibiting it. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (public officials protected by qualified immunity unless it was "'clearly established' at the time of the challenged conduct" that their conduct violated constitutional rights).

Goodman next argues that the magistrate could not have had time to review the entirety of the "5 Books." Regardless of whether this is true, the question is not whether the magistrate actually reviewed the affidavit but whether a reasonable officer could have believed that the affidavit and incorporated documents established probable cause. *See Malley*, 475 U.S. at 345. Goodman argues that the "5 Books" do not actually establish probable cause. The officers, however, knew that (1) Alan was found in a pile of blood; (2) that there was no sign of forced entry and Goodman was the only person with access to the home; and (3) that the

4

autopsy report indicated homicide. This is sufficient for a reasonable officer to believe probable cause existed.

Goodman's malicious prosecution claim against the officers therefore also fails. In order to maintain a malicious prosecution claim, a plaintiff must show that the officers acted with malice and without probable cause. *Smith v. Almada*, 640 F.3d 931, 938 (9th Cir. 2011). Assuming that the facts establish that the officers acted with malice, the existence of probable cause precludes Goodman's claim.

2. The district court also did not err in granting summary judgment to the LAPD on Goodman's claim for supervisory liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Goodman provides no evidence of any LAPD policy or customs that could form the basis of *Monell* liability. Her only evidence of ratification of wrongful acts is that the LAPD police chief stated that the homicide investigation would continue after the DA dismissed criminal charges. Goodman failed to show that LAPD encouraged, ratified, or permitted any unconstitutional behavior with respect to Goodman. *See Crowe v. County of San Diego*, 608 F.3d 406, 445 (9th Cir. 2010).

3. The district court did err, however, in granting summary judgment to Dr. Wang. Claims for false arrest and malicious prosecution against a coroner are judged according to identical standards. *Galbraith v. City of Santa Clara*, 307 F.3d

5

1119, 1126 (9th Cir. 2002). It is clearly established law that a coroner may not recklessly or intentionally falsify an autopsy report in a manner that plays a material role in a false arrest and prosecution. *Id.* In the light most favorable to Goodman, a reasonable jury could find that Dr. Wang recklessly or intentionally falsified an autopsy report when he changed Alan's cause of death from "pending investigation" to "homicide" for several reasons. First, Dr. Wang failed to follow standards H31.7 and H31.9, created by the National Association of Medical Examiners, requiring a coroner to provide a reason for the change in cause of death. Second, his report omitted evidence that Alan's injury was consistent with an accidental fall. Third, both experts the DA retained concluded Alan's death was not a homicide, with one expert concluding that Dr. Wang's report was "defective and far outside recommended national guidelines for quality of work." The experts hired by both sides for this litigation disagree as to whether Dr. Wang's report was defensible, creating a genuine issue of material fact.

**AFFIRMED** in part, **REVERSED** in part.

6

FILED

SEP 7 2017

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

I write separately because I am troubled by the LAPD officers' actions in this case. The facts reveal numerous instances in which Lois Goodman was mistreated and humiliated by officers who had to know that their case against her was weak.

On the evening of April 17, 2012, 70-year-old Mrs. Goodman arrived home around 7:30 p.m. to find blood in the entry hall, in the kitchen, and on the stairs leading up to her and her husband's bedroom. She also saw a broken coffee mug lying in a pool of blood on the staircase.

Mrs. Goodman rushed upstairs to the bedroom and found Mr. Goodman lying lifeless on their bed. He had gashes on his head and was covered in blood. Mrs. Goodman immediately called 911, saying "it looks like my husband fell on the steps."

At the time, Mr. Goodman was 80 years old. His health had been steadily declining. He suffered from high blood pressure and diabetes. He had tremors in his left hand. He was depressed and often got disoriented. He was also losing his vision.

LAPD officers quickly responded to Mrs. Goodman's 911 call. The officers were initially alarmed by the amount of blood throughout the Goodmans' home. They saw blood in the kitchen, on the stairs, and in the master bedroom. There

was blood on a carton of buttermilk in the refrigerator.  No officer saw blood spatter on the walls of the dwelling, which would indicate an assault.

After investigating the scene, the officers listed Mr. Goodman's cause of death as "accidental/head injury" on their Death Investigation Report.  The officers based this conclusion on Mr. Goodman's age, medical condition, and the lack of signs of forced entry into the Goodmans' home.  One officer observed, "[there was] no evidence of foul play . . . . The decedent possibl[y] fell down his sta[i]rs, cut his head on a broken ceramic cup and ble[d] out in his bedroom."

On April 20, 2012, three days after Mr. Goodman's death, a coroner investigator examined his body at a local mortuary.  The investigator saw several deep lacerations on the right side of Mr. Goodman's head and above his right eyebrow.  Believing these injuries to be inconsistent with an accidental fall, the investigator transferred the body to the Los Angeles County Coroner's Office.

Over the ensuing weeks, LAPD Detectives Jeffrey Briscoe, David Peteque, Nick Pikor, and Pamela Pitcher sought and obtained multiple search warrants on the Goodmans' home.  They continued to search for, but found no evidence of blood spatter.  Mrs. Goodman cooperated with each search.

Mrs. Goodman also voluntarily appeared for three interviews.  Each time, she told the officers that on the day Mr. Goodman died, they went to a doctor's appointment, the car wash, and lunch.  They arrived home around 12:45 p.m.  Mrs.

Goodman then changed into her tennis umpire's uniform and left around 1:15 p.m. to officiate nine college tennis matches at Pierce College in Woodland Hills. Afterwards, she went to the nail salon, then drove home. She arrived home around 7:30 p.m. to find Mr. Goodman dead. She called 911 at 7:32 p.m. The officers corroborated this timeline.

The officers also interviewed the Goodmans' family, friends, and doctors. Mr. Goodman's Veteran's Administration Hospital doctor told Detective Peteque that four years earlier, in 2008, he filed an Adult Protective Services complaint naming Mrs. Goodman as a suspect for neglect. However, the complaint never resulted in a criminal investigation. Mr. Goodman's podiatrist told Detectives Pikor and Peteque that she "sensed tension" between the Goodmans when she saw them the day Mr. Goodman died. But the Goodmans' daughters told Detectives Pitcher and Pikor that their parents' relationship was fine. The Goodmans' son-in-law described them as "pretty damn happy."

On April 24, 2012, one week after Mr. Goodman's death, Deputy Medical Examiner Dr. Yulai Wang conducted the autopsy. Dr. Wang recorded multiple wounds on Mr. Goodman's head, and found mug fragments inside some of them. After the autopsy, Dr. Wang described the "manner of death" as "pending investigation" so that he could conduct further investigation and testing.

Between April and August 2012, Detectives Briscoe and Peteque communicated with Dr. Wang's office at least 20 times. Detective Peteque repeatedly asked "how long it will take to close [the] case." He also told Dr. Wang's assistant that the "DA is waiting on [the coroner's] determination."

On August 7, 2012—more than three months after the autopsy and more than one month after the test results, death scene photos, and medical files became available—Dr. Wang changed the manner of Mr. Goodman's death on his autopsy report from "pending investigation" to "homicide." Dr. Wang did not explain why he made this change, despite national guidelines requiring coroners to explain changes in death classification. Dr. Wang also failed to state that some of Mr. Goodman's injuries were consistent with an accidental fall.

On August 14, 2012, Detectives Peteque and Briscoe presented their investigation to Los Angeles County Deputy District Attorney Lisa Tanner for filing consideration. The officers' theory was that Mrs. Goodman killed her husband by repeatedly striking him in the head with a coffee mug. DA Tanner reviewed the investigative materials for "an hour or two hours," and then filed a "Felony Complaint for Arrest Warrant" for murder against Lois.

Later that day, Detective Briscoe presented DA Tanner's felony complaint, along with his own "Declaration for Arrest Warrant," to a Los Angeles County Superior Court judge. Neither the felony complaint, nor the declaration, contained

detailed facts about the investigation. Instead, Detective Briscoe's declaration referred to "5 Books," which he allegedly presented to the judge. Although the contents of the five murder books are disputed, at least one report – Detective Briscoe's August 14, 2012 "Follow-Up Investigation Report" – fails to mention that Mrs. Goodman's fingerprints were not on the coffee mug (the alleged murder weapon). The report also leaves out that some of Mr. Goodman's injuries were consistent with an accidental fall, and that the officers repeatedly searched for, but found no blood spatter. Lastly, the report states that Mrs. Goodman was "calm" and "was not crying" on the night Mr. Goodman died. But Mrs. Goodman disputes this, and provides evidence that she "sobbed," was "very upset," and was "in a state of shock."

Not only did Detective Briscoe apply for an arrest warrant, he requested an arrest warrant with full extradition. He based this request on his alleged belief that, as of August 14, 2012, Mrs. Goodman was in New York, would remain there for "the next two months," and had "a valid passport thus making her a flight risk to nearby Canada."

Mrs. Goodman did indeed have plans to travel to New York to officiate at the U.S. Open. However, she planned to leave on August 19, 2012 (not August 14) and return on September 5, 2012. Additionally, her passport had expired in 1997. Mrs. Goodman claims that on August 10, 2012, her attorney called

Detective Peteque to inform him of her upcoming travel plans. Mrs. Goodman also claims that, over the course of the investigation, she repeatedly offered to surrender herself in the event that the LAPD decided to arrest her.

Nonetheless, based on Detective Briscoe's representations that Mrs. Goodman was already in New York and that she was a "flight risk," the Superior Court judge issued an arrest warrant with full extradition on August 14, 2012. Five days later, on August 19, 2012, Detectives Briscoe and Peteque traveled from Los Angeles to New York. Notably, this was the same day that Mrs. Goodman traveled from Los Angeles to New York. In fact, Mrs. Goodman's flight departed 10 hours *after* the officers' flight.

When Detectives Peteque and Briscoe arrived in New York on August 19, 2012, they sought assistance from the New York City Police Department. Two days later, on the morning of August 21, Detectives Briscoe and Peteque publicly arrested Mrs. Goodman as she left her Manhattan hotel, clad in her U.S. Open umpire's uniform.

A horde of news media captured Mrs. Goodman's arrest. Reporters photographed and videotaped officers handcuffing Mrs. Goodman and forcibly leading her to a police car. At the direction of his LAPD supervisors, Detective Peteque appeared on Good Morning America the following morning to recount the investigation.

After her arrest, the officers locked Mrs. Goodman up for two nights in Rikers Island, a New York City jail renowned for its deep-seated culture of gruesome violence.[1]

Detectives Briscoe and Peteque then flew Mrs. Goodman to Los Angeles. She remained in handcuffs the entire flight. Mrs. Goodman spent the next two weeks at the Century Regional Detention Facility in Lynwood, California. Her family was only able to post bail after a judge reduced the original bail amount of $1,000,000 to $500,000.

On September 17, 2012, about one month after Mrs. Goodman's arrest, LAPD lab tests showed that only Mr. Goodman's DNA—not Mrs. Goodman's— was on the coffee mug (the alleged murder weapon). Lab tests also showed that Mr. Goodman's blood was not on the clothing Mrs. Goodman wore the day he died. On October 2, 2012, Mrs. Goodman passed a polygraph examination.

In November 2012, DA Tanner retained two experts to review the evidence: San Bernardino County Chief Medical Examiner Dr. Frank Sheridan and Crime Scene Reconstructionist Dr. Tom Bevel. Dr. Sheridan concluded that "[t]he

---

[1] *See, e.g.*, Winnie Hu & Kate Pastor, *Trial of 5 Rikers Guards Brings Out Culture of Violence at Jail*, N.Y. Times (June 8, 2016), https://www.nytimes.com/2016/06/09/nyregion/trial-of-5-rikers-guards-brought-out-culture-of-violence-at-jail.html?mcubz=0.

manner of death is an accident." He also stated that parts of Dr. Wang's autopsy report were "extreme[ly] below standard." Similarly, Dr. Bevel concluded:

> There is merit in the original assessment that Mr. Goodman fell on the stairs and injured himself on the broken coffee cup fragments. The evidence supports this as a better explanation than one where the victim was beaten as there is no spatter or cast-off stains consistent with such an action in this scene.

On November 30, 2012, DA Tanner dismissed the criminal case against Mrs. Goodman without prejudice. The stated reason for the dismissal was that based on Dr. Sheridan's and Dr. Bevel's "new analysis of the evidence, the People concluded that the case could not be proved beyond a reasonable doubt at this time."

Nothing in the record indicates that the LAPD is conducting further investigation into Mr. Goodman's death. But, because the charges against Mrs. Goodman were dismissed without prejudice, this case continues to plague her.

In my view, no reasonable officer could have believed there was probable cause to arrest Mrs. Goodman for murder. I cannot join in holding Detectives Briscoe, Peteque, Pikor, and Pitcher unaccountable for their actions. Respectfully, I dissent from the decision to grant these officers qualified immunity.