LACY vs. COUGHLIN, 100 Mass. App. Ct. 321

 
 ANTONIO LACY vs. JOHN COUGHLIN & another. [Note 1]

100 Mass. App. Ct. 321
 February 10, 2021 - October 6, 2021

Court Below: Superior Court, Suffolk County
Present: Green, C.J., Vuono, Sullivan, Massing, & Englander, JJ. [Note 2]

 

Further appellate review granted, 489 Mass. 1104 (2022)

Constitutional Law, Imprisonment, Cruel and unusual punishment. Imprisonment, Safe environment. Practice, Civil, Directed verdict, Judgment notwithstanding verdict.

This court reversed the judgment in favor of the plaintiff in a civil action he brought under 42 U.S.C. § 1983, alleging that the defendant prison guards subjected him to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution by providing inmates with access to an unsecured hot pot in a jail in which he was being held as a pretrial detainee and suffered severe injuries when another prisoner emptied a hot pot of boiling water onto him in the middle of the night, where the facts presented did not amount to an Eighth Amendment violation as a matter of law, in that the plaintiff failed to show that under the circumstances the unsecured hot pot posed a sufficiently substantial risk to be a cruel and unusual condition of his confinement. [325-330] Massing, J., dissenting, with whom Sullivan, J., joined. Sullivan, J. dissenting, with whom Massing, J., joined.

CIVIL ACTION commenced in the Superior Court Department on April 10, 2014. 

 The case was tried before Douglas H. Wilkins, J., and motions for judgment notwithstanding the verdict or for a new trial were considered by him.

Erica Morin, Assistant Attorney General, for Thomas Gannon.

Stephen C. Pfaff for John Coughlin.

Gordon W. Spencer for the plaintiff.

 ENGLANDER, J. In 2012, the plaintiff, Antonio Lacy, was a prisoner in the now-defunct Cambridge jail. He was assaulted by 

 Page 322 

another prisoner, Stephen Cullity, who emptied a hot pot of boiling water onto him in the middle of the night, causing severe injuries. Lacy sued several of the prison guards under 42 U.S.C. § 1983, asserting that they had subjected him to "cruel and unusual punishment," in violation of the Eighth Amendment to the United States Constitution, by providing the inmates with access to an unsecured hot pot in the jail.

 The case proceeded to trial, and a jury found in favor of Lacy and awarded $1.5 million in damages against two of the guards. We now reverse the judgment. At bottom, the claim at issue results from the all too common occurrence of one prison inmate attacking another prison inmate. Such an occurrence can be the basis for an Eighth Amendment claim, if it is shown to be caused by an unconstitutional "condition of confinement," see Farmer v. Brennan, 511 U.S. 825 (1994). Such claims must be scrutinized carefully, however, lest the words "cruel and unusual punishment" be reduced to little more than ordinary negligence. The words of the clause are important, and they must be heeded when defining the right at issue. Experience teaches that it is inevitable that prisoners will fashion weapons from otherwise benign objects found in a prison and use them, but the Eighth Amendment is not addressed to the management of common prison risks. 

 To ensure consistency in the application of Eighth Amendment standards, the cases hold that the question whether a challenged prison condition poses a sufficiently substantial risk of serious harm is a question of law for the court. Here, the actions of the defendants in making the hot pot available to inmates did not amount to the "inflict[ion]" of "cruel and unusual punishment."

 Background. The Cambridge jail in 2012 occupied the top four floors of a State court house and office building. Lacy was housed on the eighteenth floor, which had four separate areas, referred to as "tiers" A, B, C, and D, configured in the shape of the letter "H." The jail was badly overcrowded at the time, and each of the four floors housed over one hundred prisoners. Because there were only fifty-eight cells on each floor, some prisoners slept in bunk beds set up in the corridors of each tier. Lacy and his attacker, Cullity, were both assigned to the B tier, Cullity to a locked cell, and Lacy to one of the bunks in the corridor. 

 The defendants, John Coughlin and Thomas Gannon, were working the midnight to 8 a.m. shift on the night of the incident. Coughlin was a line correctional officer responsible for supervision

 Page 323 

 of the prisoners on the eighteenth floor, and Gannon, his supervisor, was a captain responsible for supervising all four floors of the jail.

 Each of the tiers on the eighteenth floor had its own general use, fifty-five cup hot pot, which prisoners used to boil water for tea, coffee, ramen noodles, and similar items they could purchase at the commissary. The large hot pots had been installed about two and one-half years prior to the attack on Lacy. Before that, smaller, personal use hot pots had been available at the jail, and used for the same purpose. Those smaller hot pots had been used by inmates as weapons in two prior attacks [Note 3] -- eight and eighteen years earlier -- and they were no longer available once the larger hot pots were installed. The larger hot pots were installed because of the risks from the smaller hot pots. 

 Initially the larger hot pots were kept inside locked metal cages that were bolted to the wall in each tier, with just the nozzle sticking out. The cage doors were secured with padlocks, and the keys to the padlocks were kept in the officers' station. Coughlin and Gannon, who were both aware of the prior scalding attacks, each testified that if an inmate notified an officer that a hot pot had run out of water, the unwritten policy of the jail required the officer on duty to unlock the hot pot cage, to monitor the inmate while the inmate filled the hot pot with water and placed the hot pot back in the cage, and then to secure the padlock once again.

 For about one year after the installation of the hot pots, Coughlin kept the cage doors locked, as required. At some point, however, the hot pots in tiers A, C, and D could no longer be locked because the hasps securing the cage doors were broken. Although the hot pot on the B tier could still be locked, it became the practice to keep the B tier cage unlocked as well. Coughlin testified that he did so out of concern that the prisoners housed in B tier should have the same access to a hot pot as the prisoners in the other tiers.

 At around 3 a.m. on the night of the attack, Cullity complained to Coughlin that he was having trouble breathing. Coughlin thereafter

 Page 324 

 released Cullity from his cell and gave him permission to heat up some water in the B tier hot pot. Coughlin, who was in the officers' station monitoring six inmates on suicide watch, did not supervise Cullity as he filled the hot pot, waited for it to boil, and then carried it down the hall and dumped it on the sleeping Lacy. Lacy's resulting injuries were severe, and remain to this day. 

 As regards Gannon, the evidence would have permitted the jury to conclude that when conducting his nightly rounds about one hour before the incident, he had seen the unsecured hot pot in the B tier and taken no action. The evidence also showed that Gannon knew of the prior attacks using the smaller hot pots.

 Lacy sued Coughlin, Gannon, and Scott Brazis, [Note 4] who had been the jail superintendent at the time of the attack, under 42 U.S.C. § 1983, which provides a damages remedy to persons who have been deprived of their Federal constitutional rights. Lacy's claim was based upon the Supreme Court's decision in Farmer, which held that inmate on inmate violence could, under some circumstances, be the result of an unconstitutional condition of confinement. Farmer, 511 U.S. at 834. Lacy's theory was (1) that by allowing Cullity access to an unsecured hot pot, the defendants had created a condition of confinement with a "substantial risk of serious harm," and (2) that the defendants had been "deliberately indifferent" to that risk because they knew of the risk, and failed to follow prison policies designed to prevent it.

 The defendants raised many defenses including, relevant here, that the condition of confinement at issue -- the unsecured hot pot -- did not under the circumstances constitute a sufficiently serious risk to amount to cruel and unusual punishment. Pretrial motions to dismiss and for summary judgment were denied, and the case went to trial in Superior Court on November 8, 2018. As indicated, the jury returned a $1.5 million damages verdict against Coughlin and Gannon. The defendants argued at trial, by motions for directed verdict and for judgment notwithstanding the 

 Page 325 

verdict (judgment n.o.v.), that the facts presented did not amount to an Eighth Amendment violation as a matter of law. Those motions were denied. This appeal followed.

 Discussion. Prison officials have the "unenviable task of keeping dangerous men in safe custody under humane conditions." Farmer, 511 U.S. at 845, quoting Spain v. Procunier, 600 F.2d 189, 193 (9th Cir. 1979). Executing on this task is no mean feat. As is evident from the Eighth Amendment case law in this area, prisoners pose risks to their guards, and they pose risks to each other. [Note 5] These cases show that prisoners will fashion weapons from otherwise benign objects found in a prison -- a bag of soap, a padlock, metal taken from disassembling a bed, and so on. See Lane v. Philbin, 835 F.3d 1302, 1306 (11th Cir. 2016) ("lighting rods and other scrap metal . . . light fixture panels and locker box shelves"); Lakin v. Barnhart, 758 F.3d 66, 67-68 (1st Cir. 2014) (prison-issued padlock); Washington v. LaPorte County Sheriff's Dep't, 306 F.3d 515, 517 (7th Cir. 2002) (bars of soap wrapped in a sock); Arnold v. Jones, 891 F.2d 1370, 1372 (8th Cir. 1989) (inmate "ripped a three-foot metal support brace from a sink" to use as weapon). See also Best v. Essex County, N.J. Hall of Records, 986 F.2d 54, 57 n.7 (3d Cir. 1993). So too with boiling water. It is no response to these risks to remove all such implements from prisons, or to maintain all inmates in solitary confinement. Rather, we recognize that prisoners among other things need to eat, to sleep, and (at least to some degree), to interact with others. Providing those "humane conditions," however, will necessarily lead to the risk that implements used to eat, or to sleep, will be misused. And, the State and county funds needed to keep watch and control in these institutions are of course, limited. History teaches that,

 Page 326 

 over time, violent inmate attacks are pretty much inevitable. See Lakin, supra at 69 (quoting the prison warden: "in a prison . . . if they want to find a weapon, they will find a weapon").

 As indicated, the United States Supreme Court considered how the Eighth Amendment should apply in the context of inmate on inmate attacks in Farmer, decided in 1994. Farmer involved an allegation that prison officials had placed the plaintiff, a transgender individual, in the general prison population despite knowledge that the prison had a history of violent inmate assaults, and knowledge that the plaintiff would be "particularly vulnerable." 511 U.S. at 830-831. The Court in Farmer discussed the difficult balance that prison officials must strike, and it recognized, as it had in the past, that prison officials must be afforded considerable leeway in dealing with prisoners, and in determining and administering the conditions of confinement. See id. at 844-845. See also Bell v. Wolfish, 441 U.S. 520, 547 (1979) ("Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"). Accordingly, under Farmer, a prisoner claiming an Eighth Amendment violation arising from his conditions of confinement must meet a stringent, two-part test: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the responsible prison officials were "deliberate[ly] indifferen[t]" to that substantial risk. Farmer, supra at 834.

 In our view the plaintiff's claim fails the first prong of the Farmer test; he failed to show that under the circumstances the unsecured hot pot posed a sufficiently substantial risk to be a "cruel and unusual" condition of his confinement. In this regard, there are two further points of law that must be emphasized. The first is that the "substantial risk of serious harm" issue does not present an ordinary question of fact, to be passed on to the jury without careful judicial scrutiny. Rather, the question under the first prong is treated as a question of law: "whether prison conditions are sufficiently harmful to establish an Eighth Amendment violation, is a purely legal determination for the court to make." Torres v. Commissioner of Correction, 427 Mass. 611,

 Page 327 

 614, cert. denied, 525 U.S. 1017 (1998). [Note 6], [Note 7]

 The second point is that subsequent Federal cases (and to some extent Farmer itself), have elaborated on the types of prison conditions that can meet the substantial risk of serious harm standard. Those cases establish that the standard is not met merely because a prison risk materialized into harm on one, or even on dozens, of occasions. Thus, the Third Circuit has stated that to meet the substantial risk of serious harm test the risk at the prison must be "pervasive," Beaton v. Tennis, 460 Fed. Appx. 111, 114-115 (3d Cir. 2012); the Supreme Court in Farmer used the phrase "objectively intolerable," 511 U.S. at 846 n.9; and the Seventh Circuit has said that the risk must be "so great that [it is] almost certain to materialize" (citation omitted). Brown v. Budz, 398 F.3d 904, 911 (7th Cir. 2005). These formulations are no doubt borne of the concerns listed above; prison officials are engaged in a difficult balancing act, some risks are inevitable, and courts must be careful not to establish rules that impinge too greatly on the discretion of prison administrators. The above standards thus establish that a successful claim of cruel and unusual punishment resulting from inmate on inmate violence will be the unusual case; the Eighth Amendment is not a negligence regime, and assertions that prison officials engaged in

 Page 328 

 "unreasonable" behavior are not sufficient. [Note 8] 

 The First Circuit's decision in Lakin, 758 F.3d 66, is instructive. Notably, Lakin was authored by Justice Souter after he had left the Supreme Court; Justice Souter was also the author of the Supreme Court's decision in Farmer. Lakin involved allegations that officers at the Maine State prison had violated the Eighth Amendment by giving inmates access to padlocks (which were used to lock personal property), with knowledge that the padlocks were being used as weapons in inmate on inmate attacks. 758 F.3d at 67-69. The two plaintiffs had been victims of such attacks, and had suffered serious injuries, yet the court dismissed their Eighth Amendment claims. Id. at 71. The record in Lakin showed 372 inmate-on-inmate assaults at the prison over an eight and one-half year period; seventeen involved padlocks. Id. at 68. The First Circuit termed this a "small number of assaults"; in evaluating "when the risk of violence among inmates is sufficiently 'substantial' to satisfy the first prong of Farmer," the court deemed the padlock risk "well within the zone of those too insubstantial for an Eighth Amendment claim." Id. at 71.

 In short, the case law establishes a high bar for finding an Eighth Amendment violation arising from a condition of confinement. It accordingly is not surprising that we have not located a published appellate decision that accepts the theory that providing inmates with an unsecured hot pot constituted cruel and unusual punishment. Hot pots or other implements to boil water have been used as weapons in the past, and 42 U.S.C. § 1983 suits have been brought as a result; however, generally such claims have been dismissed as a matter of law. See Best, 986 F.2d at 57 & n.7 (no violation for supplying "coffee urn"); Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992) (no violation for supplying

 Page 329 

 "stinger" used to boil cups of water). [Note 9] Indeed, there is a long list of cases involving inmate on inmate attacks using weapons fashioned from prison objects, where courts have rejected Eighth Amendment claims as a matter of law. See, e.g., Lakin, 758 F.3d at 67-69 (padlock); Harrison v. Culliver, 746 F.3d 1288, 1299-1300 (11th Cir. 2014) (box cutter); Beaton, 460 Fed. Appx. at 113 (padlock); Peate v. McCann, 294 F.3d 879, 881 (7th Cir. 2002) ("mesh laundry bag loaded with rocks, dirt, bricks, and cement"); Washington, 306 F.3d at 517 (bars of soap in a sock).

 The facts of this case do not support a different result. As noted, the record reveals two prior instances of attacks at the jail using boiled water, but those attacks were dated; they had occurred eighteen years, and eight years, before the 2012 incident at issue here. Nor were there any other facts that would have identified a more immediate risk to Lacy; Lacy did not have a history of animosity with his attacker, Cullity, and Cullity did not have a history of attacking others at the jail. Contrast Brown, 398 F.3d at 911-913. What the plaintiff proved was that hot pots were known to the defendants to be useable as weapons, that they were supposed to be secured at the jail but had not been for some time, and that the last use as a weapon was nearly a decade before. These facts do not rise to the level of a "pervasive" risk, let alone a risk that is "almost certain to materialize." See Beaton, 460 Fed. Appx. at 114; Brown, 398 F.3d at 911. Indeed, the history of hot pot attacks here is less compelling than the history of padlock attacks that the First Circuit dismissed in Lakin. See 758 F.3d at 67, 71.

 In short, this is not a case about "cruel and unusual punishment" of prisoners, and this § 1983 claim should not have gone to the jury. Rather, this case involves injury caused by one inmate attacking another, using an implement that was placed in the prison to make the prisoner's lives more humane -- to allow them to heat their noodles, or their tea. We recognize that the plaintiff was seriously injured by Cullity's attack. And we recognize, as well, that the jury found serious omissions here on the part of the correction officer defendants, which allowed the attack to occur. Such omissions by prison officials, however, do not of 

 Page 330 

themselves equate to the infliction of cruel and unusual punishment necessary to sustain a § 1983 claim. Farmer, 511 U.S. at 835. The judgment accordingly must be reversed. [Note 10], [Note 11]

Judgment reversed.

Orders denying motions for judgment n.o.v. or for new trial reversed. [Note 12]

 MASSING, J. (dissenting, with whom Sullivan, J., joins). On the facts of this case, the plaintiff, Antonio Lacy, was required to prove two propositions: (1) "that he [was] incarcerated under conditions posing a substantial risk of serious harm," and (2) that in light of such conditions, defendants Coughlin and Gannon showed "deliberately indifference" to his safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). He was not required to prove that Coughlin's and Gannon's conduct was "cruel," "unusual," or a "punishment." "To inject the idea of 'punishment' into a deliberate indifference case like this one" only obfuscates the issues. Cotts v. Osafo, 692 F.3d 564, 568 (7th Cir. 2012). Indeed, emphasizing "punishment" is particularly inappropriate where, as here, the plaintiff is a pretrial detainee, "[f]or under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." Bell

 Page 331 

 v. Wolfish, 441 U.S. 520, 535 (1979). [Note Massing-1] In my view, as a matter of law and fact, Lacy carried his burden of proving both aspects of his § 1983 claim at trial, and the trial judge correctly determined that the defendants were not entitled to qualified immunity. I would affirm the judgment.

 The prohibition of "cruel and unusual punishments" in the Eight Amendment to the United States Constitution affords prisoners the right to "humane conditions of confinement," Farmer, 511 U.S. at 832, and requires prison officials to "take reasonable measures to guarantee the safety of the inmates," id., quoting Hudson v. Palmer, 468 U.S. 517, 526-527 (1984). Complying with the Eighth Amendment requires prison officials to "take reasonable measures to guarantee inmates' safety from attacks by other inmates." Calderon-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002). See Farmer, supra at 833, quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.), cert. denied, 488 U.S. 823 (1988) ("prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners"). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" Farmer, supra at 834, quoting Rhodes v. Chapman, 452 U.S. 337, 349 (1981). [Note Massing-2]

 1. Substantial risk of serious harm. "The first element of deliberate indifference -- whether there was a substantial risk of serious harm -- is assessed objectively and requires the plaintiff to show conditions that were extreme and posed an unreasonable risk of serious injury to his future health or safety" (quotation and citation omitted). Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019). See Lakin v. Barnhart, 758 F.3d 66, 71 (1st Cir. 2014) (Souter, J., sitting by designation), quoting Farmer, 511 U.S. at 

 Page 332 

846 ("The Supreme Court has characterized a 'substantial' risk as one that is 'objectively intolerable'").

 Whether prison conditions are sufficiently harmful under the Eighth Amendment "is a purely legal determination for the court to make." Torres v. Commissioner of Correction, 427 Mass. 611, 614, cert. denied, 525 U.S. 1017 (1998). In reviewing the judge's denial of the defendants' motions for a directed verdict and for judgment notwithstanding the verdict, however, we must construe the evidence in the light most favorable to the plaintiff, and evaluate whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff" (quotation and citation omitted). Miga v. Holyoke, 398 Mass. 343, 348 (1986). See id. at 351-352 (affirming jury verdict under § 1983 in favor of mother of pretrial detainee who died in custody). See Surprenant v. Rivas, 424 F.3d 5, 18 (1st Cir. 2005) (where jury has spoken, reviewing court's resolution of legal issues is informed by "the jury's supportable resolution of contested facts"). 

 In the context of the generalized risk of violence from a prison population, the United States Courts of Appeal have sometimes equated a "substantial" risk of harm with one that is "pervasive." See, e.g., Vandevender v. Sass, 970 F.3d 972, 977 (8th Cir. 2020); Marbury, 936 F.3d at 1234-1235, citing Harrison v. Culliver, 746 F.3d 1288, 1300 (11th Cir. 2014) (also characterizing risk as "constant threat of violence"); Lakin, 758 F.3d at 71. However, proof of "pervasive" violence is not necessary to make out a substantial risk of harm. There is no "freestanding, numerical threshold (ex ante or ex post) for the level of violence among inmates that is necessary for its risk to be considered 'substantial' under Farmer"; indeed, "Farmer itself involved a sui generis danger that apparently had never before materialized at the institution involved." Lakin, supra at 71. A "substantial risk" may include a condition that "carries an inherent threat at a substantial level, or of severity beyond the norms." Id. at 72. The Seventh Circuit "has read 'substantial risk' to mean 'risks so great that they are almost certain to materialize if nothing is done.'" Brown v. Budz, 398 F.3d 904, 911 (7th Cir. 2005), quoting Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004). Such was the case here.

 The decisions cited by the majority concerning prisoner-on-prisoner assaults using hot water, or other objects that would not

 Page 333 

 be dangerous if used as intended, do not suggest that a large, unmonitored hot pot does not create a substantial risk of injury no matter the circumstances. For example, in Lakin, 758 F.3d at 71, although the court held that the prison's policy of issuing padlocks to inmates did not create a substantial risk of serious harm, the court noted the absence of evidence that might have created "a stronger case for substantiality," such as the population of the prison, the level of violence that might be expected at an institution of similar size and character, any changes in prison management or in the potential violence of inmates housed there, or "any relevant changes in the [p]rison's practices or policies that might account for the increase in overall inmate violence."

 Thus, even if access to boiling water alone does not create a substantial risk of serious harm, other aggravating factors may increase the seriousness of the risk. Such factors were present here. The Cambridge jail had experienced an increase in the prison population, there were fewer staff, and the building conditions had deteriorated. On the night of the incident, almost twice as many inmates as the space allowed were being housed on the eighteenth floor. Before the large hot pots had been installed, at least two scalding incidents using two small hot pots had occurred. In fact, the large hot pots were installed precisely because they were a safer alternative because they could be "locked inside the hotpot cages." In addition, the prison policy requiring the hot pots to be locked, and line correctional officers to supervise inmates while they filled the hot pots, was evidence that the hot pots created a substantial risk where, as here, those safety measures were abandoned. Although there had been no prior inmate-on-inmate attacks involving the large hot pots, "an Eighth Amendment violation can arise from unsafe conditions of confinement even if no assault or similar physical injury has yet occurred." Marsh v. Butler County, 268 F.3d 1014, 1034 (11th Cir. 2001) (en banc).

 Here, the evidence showed that the risk of danger had risen over time, with the deterioration of prison conditions, to the level of being objectively intolerable. Accordingly, I disagree with the majority's conclusion that Lacy failed to prove the first prong of the Farmer test. Although the majority does not need to reach the second prong -- deliberate indifference -- or even the issue of qualified immunity to reverse the judgment, it would be necessary to address the defendants' arguments on these issues to affirm. 

 2. Deliberate indifference. "Eighth Amendment liability requires more than ordinary lack of due care for the prisoner's interests 

 Page 334 

or safety" (quotation and citation omitted). Farmer, 511 U.S. at 835. To be found liable under § 1983, a prison official must have "a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety." Norton v. Rodrigues, 955 F.3d 176, 185 (1st Cir. 2020), quoting Burrell, v. Hampshire County, 307 F.3d 1, 8 (1st Cir. 2002). See Farmer, supra at 834; Earielo v. Carlo, 98 Mass. App. Ct. 110, 116 (2020). "[A]n official acts with deliberate indifference where 'he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.'" Earielo, supra at 116, quoting Farmer, supra at 847. In short, the deliberate indifference analysis turns on "what the jailers knew and what they did in response." Burrell, supra at 8.

 Deliberate indifference has a subjective and an objective component. See Farmer, 511 U.S. at 837-839, 847. See also Staples v. Gerry, 923 F.3d 7, 13 (1st Cir. 2019). "The 'deliberate' part of 'deliberate indifference' . . . require[es] that a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Burrell, 307 F.3d at 8, quoting Farmer, supra at 837. This requires "actual, subjective appreciation of risk." Burrell, supra, quoting Giroux v. Somerset County, 178 F.3d 28, 32 (1st Cir. 1999). Subjective knowledge may be inferred from the obviousness of the risk, although the obviousness of the risk is not necessarily conclusive. See Farmer, supra at 842-843 & n.8; Burrell, supra at 8; Foster v. Commissioner of Correction (No. 1), 484 Mass. 698, 717 (2020). The deliberately indifferent state of mind "has been likened to the standard for determining criminal recklessness." Giroux, supra at 32, citing Farmer, supra at 839-840.

 The "indifference" component of deliberate indifference concerns whether an official's failure to respond to a given risk was objectively reasonable. See Farmer, 511 U.S. at 847 (prison official indifferent where the official "disregards that risk by failing to take reasonable measures to abate it"). The objective analysis requires the prisoner to show that "[g]iven the totality of the circumstances as understood by prison officials at the time, [they] . . . fail[ed] to take reasonable measures to avert potential harm." Burrell, 307 F.3d at 8. "Mere negligence, however, does not satisfy the 'deliberate indifference' standard." Duane v. Lane, 959 F.2d 673, 677 (7th Cir. 1992). See Burrell, supra.

 The defendants contend that the evidence failed to show that they actually knew of and disregarded a substantial risk of serious

 Page 335 

 harm to Lacy's health or safety, and even if they did, their conduct was merely negligent. They rely on a number of factually similar cases -- most of which are unreported, and none of which are binding on this court -- where courts found no deliberate indifference. The most authoritative of these, Duane, 959 F.2d at 675, a pre-Farmer case involving an attack on a prisoner with a cup of steaming liquid heated with an electric "stinger" device, does not help the defendants. In Duane, the court affirmed the allowance of summary judgment because the undisputed evidence showed that the prison officials had actually forbidden the use or possession of stingers in the unit where the plaintiff was housed and that they had taken measures to prevent the introduction of contraband into the unit; moreover, the plaintiff presented no evidence of the personal involvement of the defendants. Id. at 674-675. Here, the evidence showed that the defendants personally knew about the danger presented by the hot pots and took no reasonable measures to alleviate the danger -- indeed, the only action they did take made it worse.

 While the defendants' knowledge could be inferred merely from the obvious risk of keeping a fifty-five-cup hot pot unsecured in an overpopulated jail, see Farmer, 511 U.S. at 842; Foster, 484 Mass. at 717, the evidence at trial showed actual knowledge. Both defendants were aware that because of the dangers of the hot pots, prison policy required them to be locked and their use monitored. [Note Massing-3] Although Coughlin initially complied with the hot pot policy, he began intentionally to keep the B tier hot pot unlocked when the hot pots on the other tiers became "unlockable" due to broken hasps, and this became his habitual practice. On the night of the attack, Coughlin released Cullity from his cell to get hot water without supervision.

 Coughlin testified that his decision to keep the hot pot on the B tier unsecured was intended to pacify the prisoners by maintaining "the same rules, the same access." While "[p]rison [officials] . . .

 Page 336 

 should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security," Bell, 441 U.S. at 547, the jury were warranted in concluding that maintaining a policy of open access to the hot pots, and failing to supervise Cullity's use of the hot pot in an overcrowded tier at 3 a.m., was not a reasonable response to a dangerous condition and manifested deliberate indifference to an intolerable risk. 

 Likewise, the evidence at trial permitted the jury to conclude that Gannon was aware of, and acted in disregard of, the risk posed by the unsecured hot pot on the B tier. At trial, Gannon denied knowing that the B side hot pot was kept unlocked, or that the locks securing the three other hot pots on the eighteenth floor were broken. He testified that only once had he observed that one of the cage doors was ajar; upon inquiring, he was told that the hasp was broken, and he instructed an officer to file a maintenance report. He was unaware of whether any further action was taken. However, Gannon conducted weekly, if not nightly, rounds -- Coughlin testified that he often saw Gannon during his shifts -- including on the B tier. He had been on the eighteenth floor about one hour before Cullity's attack on Lacy. [Note Massing-4] This evidence permitted the jury to conclude that Gannon was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he "dr[e]w the inference." Farmer, 511 U.S. at 837. Moreover, the jury could conclude that Gannon's response to the risk -- ignoring it -- was not objectively reasonable.

 The absence of evidence that the defendants were aware of any prior animosity between Lacy and Cullity does not preclude a finding of deliberate indifference. "[A] prison official [cannot] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by [a] specific prisoner." Farmer, 511 U.S. at 843. See Leite v. Bergeron, 911 F.3d 47, 53 n.5 (1st Cir. 2018), quoting Calderon-Ortiz, 300 F.3d at 65 ("[u]nder Farmer . . . it is

 Page 337 

 irrelevant 'whether the prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk'").

 Because sufficient evidence supported the jury's conclusion that both defendants knew of and unreasonably disregarded the risk posed by the B tier hot pot, the judge did not err in denying the defendants' motions for directed verdict and for judgment notwithstanding the verdict on the ground that Lacy failed to prove an Eighth Amendment violation. 

 3. Qualified immunity. The defendants also argue that even if their conduct violated Lacy's constitutional rights, they were entitled to the defense of qualified immunity. "The doctrine of qualified immunity shields government officials, performing discretionary tasks, from liability for civil damages . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Earielo, 98 Mass. App. Ct. at 115, quoting Ahmad v. Department of Correction, 446 Mass. 479, 484 (2006). 

 Determining whether a government official is entitled to qualified immunity entails a two-step inquiry. The court must consider (1) whether the official's conduct violated a constitutional right of the plaintiff, and (2) whether that right was "clearly established" at the time of the conduct. Earielo, 98 Mass. App. Ct. at 115, quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009). "A negative answer to either query results in the application of qualified immunity in favor of the defendant official." Earielo, supra. As I believe that the first question should be answered in the affirmative, the defendants' entitlement to qualified immunity turns on whether the right they violated was clearly established at the time of the incident, which is a question of law. See Ahmad, 446 Mass. at 484; Ahearn v. Vose, 64 Mass. App. Ct. 403, 421 (2005). [Note Massing-5]

 A right is clearly established when its "contours [are] so well

 Page 338 

 defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted" (quotation and citation omitted). District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). See Hope v. Pelzer, 536 U.S. 730, 739 (2002). That is, "existing precedent must have placed the statutory or constitutional question beyond debate" at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). The constitutional right must be defined with sufficient particularity to give officials "fair warning" that a given course of conduct violates that right. Hope, supra at 741. See Irish v. Fowler, 979 F.3d 65, 76 (1st Cir. 2020), petition for cert. filed, No. 20-1392 (Apr. 1, 2021). "A rule is too general if the unlawfulness of the [official's] conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" Wesby, supra at 590, quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987).

 "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." Hope, 536 U.S. at 739. "[A] case directly on point" is not required. al-Kidd, 563 U.S. at 741. "In other words, '[t]o overcome a claim of immunity, it is not necessary for the courts to have previously considered a particular situation identical to the one faced by the government official.'" Earielo, 98 Mass. App. Ct. at 118, quoting Caron v. Silvia, 32 Mass. App. Ct. 271, 273 (1992). See, e.g., Walton v. Dawson, 752 F.3d 1109, 1118 (8th Cir. 2014) (jail administrator not entitled to summary judgment on qualified immunity grounds in case of rape of pretrial detainee by sentenced inmate, where defendant knew jail cells were not being locked at night and that this created obvious, substantial risk to inmate safety; "no doubt the right at issue -- a pretrial detainee's right to be protected from sexual assault by another inmate -- is clearly established"); Marsh, 268 F.3d at 1034 (qualified immunity not available to sheriff at pleading stage where plaintiffs who were beaten by groups of other inmates alleged that cells were kept unlocked, facility was dilapidated, and supervision was lax; "no reasonable sheriff could have concluded that the alleged conditions at the [j]ail failed to pose a substantial risk of serious harm," and "it was clearly established in this Circuit that it is an unreasonable response for an official to do nothing when confronted with prison conditions . . . that pose a risk of serious physical harm to inmates").

 Page 339 

 Although there is no case directly on point, I agree with Lacy and the trial judge that Farmer's prohibition against deliberate indifference to conditions of confinement that pose a substantial risk of serious harm to prisoners' safety was so clearly established that the defendants should have known that their actions violated the Eighth Amendment. The broken hasps on three of the hot pots created a danger "almost certain to materialize if nothing [was] done" (citation omitted). Brown, 398 F.3d at 911. Faced with an obvious condition that interfered with their obligation to prevent prisoner-on-prisoner violence, rather than fix or vigilantly monitor the hot pots that could not be locked, Coughlin and Gannon instead unlocked, or permitted to remain unlocked, the only one that could be secured. They had fair notice that they could be liable for such conduct. See Earielo, 98 Mass. App. Ct. at 118 (where general constitutional rule applies with obvious clarity, "the plaintiff does not need to identify a preexisting case on point or a consensus of persuasive authority"). I agree with the trial judge that the defendants were not entitled to qualified immunity.

 One final observation is in order. To a certain extent, Coughlin and Gannon were victims of circumstance -- they happened to be on duty the night when this horrific incident occurred. Though, in my view, they acted with deliberate indifference to an unreasonably dangerous condition, the condition was not of their making -- it was the result of an underfunded and overcrowded jail. However, as discussed in Justice Sullivan's dissent, see post, in which I join, the current state of the law makes it all but impossible for a plaintiff to recover under § 1983 from State, county, or supervisory officials based on systemic causes of dangerous prison conditions. See also ante at note 4. Nonetheless, the jury found, correctly in my view, that Lacy satisfied his burden of proving a § 1983 violation by these two defendants, and awarded damages accordingly. I respectfully dissent.

 SULLIVAN, J. (dissenting, with whom Massing, J., joins). I fully agree with Justice Massing's well-crafted dissent. I write separately to underscore the need for legislative action at either the State or Federal level to address the pervasive flaws in our current civil rights and qualified immunity jurisprudence.

 Page 340 

 Relying on what it understands to be settled law, the majority states that there was no substantial risk of serious harm presented by the unsecured hot pot. In support of its analysis the majority points to the dearth of cases "that accept[] the theory that providing inmates with an unsecured hot pot constituted cruel and unusual punishment." Ante at 328. The relative lack of published authority as to what constitutes a constitutional violation under § 1983 is no accident. It is the direct result of U.S. Supreme Court cases which created the doctrine of qualified immunity and systematically curtailed the reach of § 1983.

 Until 2009, courts deciding claims of qualified immunity were directed to first decide whether there had been a deprivation of constitutional rights, and if so, whether the right had been clearly established at the time of the alleged infringement. See Saucier v. Katz, 533 U.S. 194 (2001). In 2009 the Supreme Court changed the rules. See Pearson v. Callahan, 555 U.S. 223 (2009). It held that Federal court judges could first decide whether there was a clearly established right, and if there was, then address whether there was a constitutional violation. Id. at 236. "Thus, if a court decides to grant qualified immunity because there is no violation of clearly established law, it may never answer whether there was a constitutional violation." Watson, "Yes Harm, No Foul": Recalibrating Qualified Immunity, 64 Wash. U. J.L. & Pol'y 231, 237 (2021). As a result, not only are cases routinely dismissed before trial, but the law has stagnated. Plaintiffs, including this plaintiff, face daunting prospects in proving the existence of a constitutional violation in a § 1983 case. See Jamison v. McClendon, 476 F. Supp. 3d 386, 408-409 nn.164-166 (S.D. Miss. 2020).

 This curtailment of an important civil rights statute is an exclusively judicial creation. The doctrine of qualified immunity does not appear anywhere in the Federal statute, see § 1 of the Ku Klux Klan Act of 1871, c. 22, 17 Stat. 13 (1871), codified at 42 U.S.C. § 1983, and is not constitutionally derived.

 The defense of qualified immunity did not enter the legal lexicon for nearly a century. In 1961, the Supreme Court interpreted § 1983 to include suits against State actors for deprivation of constitutional rights as a result of violation of State law. See Monroe v. Pape, 365 U.S. 167, 183 (1961). This resulted in a dramatic increase in § 1983 litigation in Federal court. See Watson,

 Page 341 

 64 Wash. U. J.L. & Pol'y at 235-236, 241. [Note Sullivan-1] The doctrine of qualified immunity emerged in 1967, providing limited immunity from suit (not just a defense to liability) to State and municipal employees charged with civil rights violations who acted in good faith. See Pierson v. Ray, 386 U.S. 547 (1967). Subsequently, in Harlow v. Fitzgerald, 457 U.S. 800 (1982), the Supreme Court deleted the good faith requirement and reformulated the standard for granting qualified immunity, resulting in the broader standard we apply today, a standard designed to "protect[] . . . all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). On top of that expansion, the Supreme Court then delivered the coup de grace when it ruled that judges need no longer decide whether there had been a violation of a constitutional right. Pearson, 555 U.S. at 236-242.

 The Supreme Court has offered a variety of rationales for its vigorous expansion of the qualified immunity doctrine, and concomitant curtailment of § 1983, ranging from the protection of police officers from damage awards, to the costs and distractions attendant to litigation. See Watson, 64 Wash. U. J.L. & Pol'y at 237-238, and cases cited. Over time the Supreme Court's reliance on the risk of damage awards against individuals has receded. There is scant evidence, for example, that police officers, as opposed to the municipalities themselves, ever pay § 1983 awards. See, e.g., id. at 238 n.46, citing Schwartz, Police Indemnification, 89 N.Y.U. L. Rev. 885, 936-937 (2014). Instead, the Supreme Court now focuses on policy arguments, that is, the need to shield government officials and employees from the time and expense of litigation and the "social costs" of "insubstantial claims." Harlow, 457 U.S. at 814, 816. [Note Sullivan-2]

 Page 342 

 There has been longstanding criticism of these justifications. Voices as disparate as those of Justice Clarence Thomas [Note Sullivan-3] and Justice Sonia Sotomayor [Note Sullivan-4] have called for a reexamination of qualified immunity. In recent years the tide of commentators (of varying stripes) critical of the doctrine has risen. [Note Sullivan-5] These critiques range from research-based papers designed to show that the doctrine does not meet its intended policy goals, to those which observe that "qualified immunity [has] developed as camouflage for civil rights policy decisions," Diana Hassel, Living a Lie: The Cost of Qualified Immunity, 64 Mo. L. Rev. 123, 123 (1999), to those which posit that the Supreme Court cases have, in effect, eroded § 1983 by (among other things) ensuring that cases are dismissed at the earliest stage possible without any consideration whether there was a constitutional right at stake. See note 5, supra. As a result, some constitutional rights may not ever become clearly established.

 While I agree with Justice Massing that the right was clearly established here, the current case is yet another example of the collateral damage done by a qualified immunity doctrine which aggressively terminates cases at the earliest stages of litigation without any development of the law. It also demonstrates the degree to which the effort to balance enforcement of basic civil rights with the interest of the State in avoiding unwarranted litigation has veered hopelessly off course. A fifty-five cup hot pot was left unsecured in a massively (and systematically) overcrowded jail. A pretrial detainee was maimed for life when scalding water was poured over his midsection, burning his arms, legs, buttocks, and genitals. The majority, adhering to what it 

 Page 343 

understands Supreme Court precedent to require, posits that given the prevalence of inmate-on-inmate violence, this was the result of mere negligence, if that, and that there was no constitutional violation. Thus, if the majority is correct, the Supreme Court has declared, for all intents and purposes, that "these things happen."

 This turns § 1983 on its head. [Note Sullivan-6] A statute designed to protect the rights of the marginalized from governmental deprivation of civil rights has been overwhelmed by the interests of the government, even where the government has caused grievous injury in what a jury found to be obvious disregard of well-known dangers. [Note Sullivan-7]

 The most efficacious way out of this tangle is statutory. Any amendment to § 1983 lies in the hands of Congress. But as the majority opinion points out, ante at note 11, there was a State law claim in this case that was dismissed prior to trial. See Massachusetts Torts Claims Act, G. L. c. 258, § 4. See also Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H & 11I. Our State statutes have their own complicated structure of exceptions and 

 Page 344 

immunities. [Note Sullivan-8] It is well within the powers of the General Court, however, to strengthen our civil rights statutes generally, or to modify the qualified immunity doctrine in particular. Such an endeavor is exactly the kind of policy decision a legislative body is suited to undertake. Legislative action would be vastly preferable to the slow pace and deep uncertainty of case-by-case adjudication, and could provide a measure of protection now denied to those whom the civil rights statutes were intended to safeguard.

 In 2020 the General Court enacted an Act Relative to Justice, Equity and Accountability in Law Enforcement in the Commonwealth, colloquially known as the "police reform bill." See St. 2020, c. 253. Chapter 253 established a special commission "to investigate and study the impact to the administration of justice of the qualified immunity doctrine in the commonwealth." St. 2020, c. 253, § 116 (a). The citizens of the Commonwealth can hope that the commissioners and the Legislature consider this case, and so many others like it, in formulating a legislative response to the doctrine of qualified immunity, and in taking a broader look at our civil rights statutes as a whole.

 This broader examination is critical because "using the immunity defense as the language of the debate over the proper limits of civil rights remedies obscures choices that are being made on the fundamental and divisive issue of what constitutional wrongs should be compensated." Hassel, 64 Mo. L. Rev. at 123. The difficulty of resolving important and competing policy considerations should not deter the effort. No one in this Commonwealth who has suffered grievous injury (or death) at the hands of State or municipal employees in circumstances such as these should be told that the violation of his or her civil rights is unworthy of consideration or redress.

FOOTNOTES
[Note 1] Thomas Gannon. 

[Note 2] This case was initially heard by a panel comprised of Justices Sullivan, Massing, and Englander. After circulation of a majority and a dissenting opinion to the other justices of the Appeals Court, the panel was expanded to include Chief Justice Green and Justice Vuono. See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993). 

[Note 3] Gannon, in his brief, states that prior attacks using hot water from a small individual hot pot occurred in "two instances, around 1988 or 1994 and again in 2003 or 2004." The plaintiff does not argue otherwise. However, the testimony at trial suggests that there may have been three such attacks -- first in 1988, again in 1994, and finally in 2003 or 2004. Whether there was a third prior attack, twenty-four years earlier, is not material to our decision. 

[Note 4] The jury returned a verdict in favor of Brazis, a verdict that Lacy has not appealed. In his complaint, Lacy also named Middlesex County Sheriff Peter Koutoujian, and brought a negligence claim under the Massachusetts Tort Claims Act, G. L. c. 258, against the Middlesex County Sheriff's Department (MCSD). Sheriff Koutoujian was dismissed on summary judgment, and Lacy filed a stipulation of dismissal as to the claims against MCSD. We note that the Commonwealth is not a suable "person" under § 1983, Will v. Michigan Dep't of State Police, 491 U.S. 58, 65-66 (1989), and that a county can only be liable if the constitutional deprivation is the result of a county "custom" or "policy." See City of Canton v. Harris, 489 U.S. 378, 388-389 (1989). 

[Note 5] Lacy was a pretrial detainee at the time of the attack. While pretrial detainees are not afforded the protections of the Eighth Amendment, the due process clause of the Fourteenth Amendment provides pretrial detainees "equivalent" protection to that of the Eighth Amendment. See Miga v. Holyoke, 398 Mass. 343, 350-351 & n.9 (1986), citing Bell v. Wolfish, 441 U.S. 520, 545 (1979). 

 In the opening paragraph of his dissent, Justice Massing seems to suggest that pretrial detainees have greater constitutional protections, in terms of conditions of confinement, than those provided by the Eighth Amendment. No case so holds. See, e.g., Miga, 398 Mass. at 350-351; Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir. 2002). Indeed, as the dissent acknowledges, the plaintiff presented and briefed this case as an Eighth Amendment claim. We accordingly analyze the plaintiff's claim by applying the developed body of Eighth Amendment case law.

[Note 6] Torres thus establishes that the judge should have evaluated the prong one issue as a matter of law. We note that this legal question was presented to the judge by the defendants' motions for directed verdict and for judgment n.o.v. While the plaintiff claims that the question whether he had shown a sufficiently "substantial risk of serious harm" was not raised in the motion for directed verdict and was therefore waived, the plaintiff is wrong; the issue was sufficiently raised in both defendants' motions for directed verdict. 

 Because this case should have been dismissed under the first prong of the Farmer test, there is no need to address the second prong -- whether the defendants were "deliberately indifferent" to the risk at issue. Regardless of the jury's finding of deliberate indifference, there was simply no Eighth Amendment violation here.

[Note 7] Citing the test set forth in Farmer, the dissent asserts that Lacy "was not required to prove that [the defendants'] conduct was 'cruel,' 'unusual,' or a 'punishment.'" Post at 330 (Massing, J., dissenting). The implication is that somehow, the language of the Eighth Amendment has become irrelevant in evaluating the plaintiff's Eighth Amendment claim. We disagree. As noted, the question whether the condition of confinement presents a sufficiently serious risk is one of law, and in evaluating that question the touchstone for the courts must of course be the language of the Constitution. Farmer is not to the contrary. 

[Note 8] Much of the trial here involved evidence and argument to the effect that the prison official defendants did not adequately protect Lacy against the risk from the hot pot that eventually materialized -- for example, that the defendants failed to follow "prison policy." While this is not surprising given the requirement to prove "deliberate indifference," we note that a great deal of the evidence was couched in the language of negligence -- that is, what the defendants "should have" done. Such a presentation fails to account for the constitutional right at issue. 

 The judge's charge included the sentence, "[J]ail officials have a duty to take reasonable measures to guarantee the safety of inmates." This phrase is particularly troublesome in a jury instruction (even though it can be derived from language in the Farmer opinion). There is no such "guarantee" of safety, as Farmer itself recognizes. Farmer, 511 U.S. at 832-834.

[Note 9] We are aware of an unpublished opinion from the Ninth Circuit that allowed a hot pot-based claim to survive summary judgment, although in that case, unlike here, there had been a significant number of recent scalding attacks. See Washington v. Rowland, 29 F.3d 638 (9th Cir. 1994). 

[Note 10] The dissent recounts at some length facts showing that the Cambridge jail was overcrowded and in disrepair at the time of the assault. See post at 333 (Massing, J., dissenting). It is far from clear that such facts are material to the Eighth Amendment issue before us -- at least where there was no evidence that the conditions had led to an increase in inmate on inmate violence. Since this is not a negligence case, it is not enough to criticize the conditions at the jail, or the actions of the State and the correction officers, as lacking reasonable care. In our view the dissent errs by treating evidence of unreasonable behavior and conditions as the equivalent of a constitutional violation. It is not. 

[Note 11] As we have noted, Lacy did bring an action under the Massachusetts Tort Claims Act (MTCA) against one of the defendants -- the MCSD. Unlike a constitutional claim under § 1983, MTCA claims can be based in negligence, but are subject to a variety of immunities retained by the Legislature in the MTCA -- including, in particular, the immunity under G. L. c. 258, § 10 (j). The claim was voluntarily dismissed prior to trial. 

[Note 12] The plaintiff's request for appellate attorney's fees is denied. 

[Note Massing-1] Pretrial detainees, "who have not been convicted of any crimes . . . 'retain at least those constitutional rights that [the Supreme Court has] held are enjoyed by convicted prisoners'" (emphasis added). Miga v. Holyoke, 398 Mass. 343, 350-351 (1986), quoting Bell, 441 U.S. at 545. I acknowledge that Lacy makes no separate argument invoking his substantive due process rights, and that this appeal is governed by Eighth Amendment principles. 

[Note Massing-2] Of course, prison officials cannot "guarantee" that one prisoner will not be attacked by another. The trial judge's instructions on this point, see ante at note 8, to which the defendants did not object at trial or on appeal, made that clear. The judge instructed that "the law also recognizes the realities of the jail setting," and that the deliberate indifference standard "does not . . . impose a guarantee of safety." Thus, the judge explained, a prison official who responds reasonably to a dangerous condition is not liable "even if his response is not ultimately successful in avoiding the harm to the plaintiff." 

[Note Massing-3] A violation of policy alone does not give rise to constitutional liability. See Baptiste v. Executive Office of Health & Human Servs., 97 Mass. App. Ct. 110, 118 (2020), cert. denied, 209 L. Ed. 2d 752 (May 17, 2021) ("knowledge of noncompliance with a single safety regulation does not plausibly suggest that the [d]efendants were on notice of . . . a substantial risk of serious harm or that they were deliberately indifferent to such a risk" [quotation and citation omitted]). However, the existence of a safety policy and the defendants' knowledge of it is relevant to show both their subjective awareness of the risk and their objective indifference to it. See Walton v. Dawson, 752 F.3d 1109, 1120-1122 (8th Cir. 2014). 

[Note Massing-4] Gannon initially testified that he did not remember doing a round on the eighteenth floor on December 14 before the attack occurred, despite prior statements to investigators that he had done a round at 2:05 a.m. He later conceded that he visited the officers' station, but insisted he did not go to the B tier. 

[Note Massing-5] Lacy argues, with some force, that a finding of deliberate indifference is logically inconsistent with qualified immunity. See Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001) ("Because deliberate indifference under Farmer requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent"). But see Sandoval v. County of San Diego, 985 F.3d 657, 676 n.11 (9th Cir. 2021) ("qualified immunity is distinct from the merits of the plaintiff's constitutional claim"); Thompson v. Upshur County, Tex., 245 F.3d 447, 459 (5th Cir. 2001) (emphasizing "the difference between the objective reasonableness standard for qualified immunity . . . and the subjective deliberate indifference standard for section 1983 liability"). As I believe that the right at issue was clearly established, I need not resolve this question. 

[Note Sullivan-1] For the history of the first one hundred years of the Ku Klux Klan Act see Jamison, 476 F. Supp. 3d at 399-401. During that time period, other provisions of the Act were abnegated by the courts. Section 1 of the Act, now codified as § 1983, was "forgotten" until Monroe was decided in 1961. Jamison, supra at 401. 

[Note Sullivan-2] "[I]t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty -- at a cost not only to the defendant officials, but to society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950)." Harlow, 457 U.S. at 814. See Ashcroft v. Iqbal, 556 U.S. 662, 685 (2009) (terminating litigation prediscovery); Pearson, 555 U.S. at 237 ("Unnecessary litigation of constitutional issues also wastes the parties' resources"). 

[Note Sullivan-3] See Ziglar v. Abbasi, 137 S. Ct. 1843, 1871-1872 (2017) (Thomas, J., concurring). 

[Note Sullivan-4] See Kisela v. Hughes, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting). 

[Note Sullivan-5] See, e.g., Baude, Is Qualified Immunity Unlawful, 106 Calif. L. Rev. 45, 49-51 (2018); Hassel, Living a Lie: The Cost of Qualified Immunity, 64 Mo. L. Rev. 123 (1999); Lammon, Assumed Facts and Blatant Contradictions in Qualified Immunity Appeals, 55 Ga. L. Rev. 959 (2021); Schwartz, After Qualified Immunity, 120 Colum. L. Rev. 309 (2020); Schwartz, The Case against Qualified Immunity, 93 Notre Dame L. Rev. 1797 (2018); Watson, 64 Wash. U. J.L. & Pol'y 231, supra; Kinports, The Supreme Court's Quiet Expansion of Qualified Immunity, 100 Minn. L. Rev. Headnotes 62 (2016). 

[Note Sullivan-6] We need only consider a more everyday example. Anyone who has ever prepared a holiday meal and tried to carry a pot of boiling water across a crowed kitchen is well aware of the dangers posed. It would be unthinkable -- and dangerous in the extreme -- for a holiday host to invite two times as many people into the kitchen and jostle through the crowd, boiling pot in hand, or to leave a giant pot of boiling hot water unattended on a nearby table or chair. The jury were entitled to find that it was palpably dangerous to leave a giant hot pot in an unsecured, overcrowded penal facility, a facility which required that large hot pots be kept under lock and key, and in which much smaller hot pots had been banned from cells because they were used to attack other inmates and detainees. 

 To paraphrase Justice Ruth Bader Ginsburg, the majority's conclusion that the defendants should be granted judgment as a matter of law in part because the facility had gone twenty years without a hot pot attack simply gets it backwards, disregarding the efficacy of the in-cell hot pot ban and the policy that the larger hot pots be under lock and key. "Throwing out" the hot pot policy "when it has worked . . . is like throwing away your umbrella in a rainstorm because you are not getting wet." Shelby County v. Holder, 570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).

[Note Sullivan-7] The cases cited by the majority, ante at 325, involving soap and bed frame parts are inapposite. A pot of boiling water is a dangerous object. Soap and beds are not. They may be fashioned into weapons, which is why corrections officials ban the use of such weapons and conduct searches to discover them. This case is more analogous to leaving a stack of sharpened toothbrushes in the middle of a cell block, an act which a jury certainly could find was dangerous. Some prisoners may simply want another toothbrush, but inevitably, someone is going to use one as a shank. 

[Note Sullivan-8] Under current law, for example, the Federal qualified immunity doctrine is applied to State civil rights claims. "Public officials have the same protection for violations of the Massachusetts Civil Rights Act, G. L. c. 12, § 11I, as they have under Federal law for violations of 42 U.S.C. § 1983." Ortiz v. Morris, 97 Mass. App. Ct. 358, 362 (2020), citing Duarte v. Healy, 405 Mass. 43, 46 (1989). 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.